540 A.2d 1165

**Lawrence L. FISHER**

v.

**Carol C. FISHER.**

**No. 1324, Sept.Term, 1987.**

Court of Special Appeals of Maryland.

May 9, 1988.

Certiorari Denied June 27, 1988.

194

Lawrence L. Bell (James M. Hoffman, on the brief) Chevy Chase, for appellant.

Nelson Oneglia, College Park, for appellee.

Argued before MOYLAN, WILNER and BLOOM, JJ.

WILNER, Judge.

After 27 years of marriage, Lawrence and Carol Fisher separated in 1977. As a testament to their parting, they entered into a separation agreement that, among other things, obligated Lawrence to pay a certain level of periodic support to Carol during their joint lives or until "such time as the Wife is remarried or enters into a marriage-type arrangement." The agreement, including this support provision, was incorporated, but not merged, into a divorce

decree entered by the Circuit Court for Montgomery County in January, 1979.

Lawrence paid the required support until March, 1986, when he concluded that Carol had entered into a "marriage-type arrangement" with one Robert Weiss and thus discontinued his payments. Carol responded, fairly promptly, with a petition to hold Lawrence in contempt of court. The matter was referred to the court's domestic relations master who, in July, 1986, concluded that Carol had not entered into a "marriage-type relationship," found Lawrence to be $5,648 in arrears, and recommended that, if that sum was not paid to Carol by August 31, Lawrence should be held in contempt.

Lawrence filed exceptions. Eventually, the court over-ruled those exceptions and signed an order essentially as proposed by the master. This appeal ensued. Lawrence argues:

> "I. The Circuit Court denied the Appellant procedural due process by failing to make an independent determination based upon the entire record.
>
> II. The Circuit Court erred by not applying the principles of contract law to the facts presented.
>
> III. The Circuit Court's ruling that Carol Fisher had not engaged in a marriage-type arrangement within the intention of the parties was clearly erroneous."

Finding no error, we shall affirm.

### (1) *Procedure*

To appreciate Lawrence's first complaint, we have to review the procedural history of the matter now before us in light of Md.Rule 2–541, which governs proceedings before a domestic relations master. With respect to contempt petitions based on noncompliance with support orders, the Rule sets up essentially the following procedure. After a hearing, the master must notify each party of his proposed recommendations, either orally at the conclusion of the hearing or in writing. If, within five days from the giving (or service) of that notice, a party files with the master a

statement of his or her intention to file exceptions to the master's recommendations, the master must file a full report with the court. The report must include the original exhibits and the master's findings of fact, conclusions of law, and proposed order. It need not contain a transcript of the proceeding before the master unless one has already been prepared; to the extent that a transcript is necessary to the exceptions and has not already been prepared, the excepting party must produce it. If a notice of intention to file exceptions is not filed within the five-day period, the master files only his recommendations, not a report.

Failure to file the notice of intention constitutes a waiver of the right to file exceptions, and the order proposed by the master may be signed by the court as of course. If the notice is given, however, the proposed order, accompanying the report, is usually not to be signed until the time allowed for filing the actual exceptions has expired. One clear exception to that, however, is that "[o]n the recommendation by the master that an individual be found in contempt, the court may hold a hearing and enter an order at any time." Md.Rule 2–541(g)(3).

A party has 10 days after the filing of the report to file specific, written exceptions. The exceptions, says section (i) of the Rule:

"shall be decided on the evidence presented to the master unless: (1) the excepting party sets forth with particularity the additional evidence to be offered and the reasons why the evidence was not offered before the master, and (2) the court determines that the additional evidence should be considered. If additional evidence is to be considered, the court may remand the matter to the master to hear the additional evidence and to make appropriate findings or conclusions, or the court may hear and consider the additional evidence or conduct a de novo hearing."

The master made his recommendations in this case in the form of a proposed contempt order mailed to counsel on July 30, 1986. Although Lawrence apparently mailed a

timely notice of his intention to file exceptions, the master, for whatever reason, did not receive the notice. He therefore simply filed his proposed order, as the Rule directed him to do. In the belief that no exceptions would (or could) be filed,[1] Judge Mitchell signed the proposed order on August 11, 1986. That order, as we indicated, declared an arrearage but did not include an immediate finding of contempt; rather, it provided that Lawrence would be found in contempt if the arrearage was not paid by August 31.

When it came to light that Lawrence had indeed filed a timely notice of intention to except, the court, on November 21, 1986, found an irregularity and clerical error in the entry of the August 11 order and struck the order. The master eventually filed his report (on June 25, 1987), following which Lawrence filed written exceptions and an extensive memorandum of law in support of them. Carol filed an answer to the exceptions and a memorandum of law in support of her answer. Neither party requested a hearing.

On August 28, 1987, the court signed a slightly revised version of the order initially proposed by the master. It declared an arrearage of $5,648, found Lawrence to be in contempt by failing to pay that amount by August 31, 1986, sentenced him to 10 days in the county detention center, but allowed him to purge himself of the contempt by paying the arrearage by September 30, 1987. Unfortunately, that order did not expressly mention Lawrence's exceptions, a deficiency that the court endeavored to correct on September 24. In a further order filed that day, the court recognized that the August 28 order had made no "explicit disposition" of the exceptions and that "a further clarification may be necessary." It thereupon proceeded expressly to overrule those exceptions.

---

1. The record contains a "Line" filed by the master stating that "no Notice of Intent to Except has been timely delivered" to the master. The "Line" is dated August 8, 1986, but it was not stamped as filed with the clerk until August 19.

Lawrence appears to make two complaints about this procedure. First, he contends that the court erred in failing to make an independent review of the record made before the master; second, he argues that, by signing the contempt order before ruling on the exceptions, the court denied him procedural due process.

With respect to the first of these complaints, we would observe that the underlying facts concerning the relationship between Carol and Mr. Weiss were not really in dispute. The dispute was over the conclusion to be drawn from those facts—did the contacts between the two of them suffice to constitute a "marriage-type arrangement"? In that regard, the court had before it not only the master's report, which set forth his findings of fact, but fairly extensive memoranda from the parties presenting their respective positions. There is nothing here to suggest that the court did not have before it all that it needed to decide the issue. Lawrence's second complaint is equally without merit. By signing the contempt order on August 28, the court necessarily rejected the legal position being espoused by Lawrence—that he was excused from any obligation for support payments because of Carol's relationship with Mr. Weiss. The subsequent order was simply a technical clarification, not a new substantive ruling. We find no due process violation.

### (2) *Substance*

Lawrence's second and third arguments overlap to some extent and may be considered together. They raise the substantive question of whether the court erred in finding that Carol and Mr. Weiss had not entered into a "marriage-type arrangement."

Until 1981, Carol and Mr. Weiss both lived in Montgomery County. She had considered him her "boyfriend" since 1977. In 1981, Carol acquired a farm in St. Mary's County and moved there to live. Mr. Weiss occasionally visited her on weekends. In 1984, upon his retirement, he too moved to St. Mary's County, acquiring a residence near Carol's farm. They have always maintained separate residences;

they have never held themselves out as man and wife; and neither has made any significant contribution to the living expenses of the other. They have no assets in common.

Mr. Weiss owns some horses which he boards on Carol's farm. He comes over to her farm every day to feed his horses. He sometimes has meals with her during the week but visits her mostly on the weekends, occasionally staying overnight. They have had occasional sexual contact and have given each other gifts. Mr. Weiss keeps some clothing at her house; he does some chores and maintenance for her; they do some "socializing" together—dinners out and short trips. Although he has a key to her house, he usually knocks before entering. This was the undisputed evidence.

Lawrence contends that the term "marriage-type arrangement" is ambiguous, and that the master erred in finding it to be unambiguous. It is, of course, with some ill grace that Lawrence makes this argument, as he (through his lawyer) drafted the separation agreement and caused this particular provision to be inserted for his benefit. Subject to Carol's consent, he could have worded the provision differently, to provide for termination if Carol "acquired a boyfriend" or "regularly entertained a man in her home," or upon any other of a nearly infinite variety of circumstances. He chose the term at issue.

In fact, it is not an ambiguous term. It is not intrinsically unclear; its contours can be defined without the benefit of extrinsic facts. Courts have defined the concept of marriage; its features are well and commonly recognized. In the context in which the term was used in this agreement, it is clear that what was intended was a termination of support if Carol either entered into another formal marriage or a relationship having the basic features of a marriage but lacking the ceremonial formality required by law for a valid marriage. That is what we think the term, taken in context, would mean to any reasonable person.

Although the particular language, "marriage-type arrangement," may be unique, the concept which it embodies is not. Clauses of this type are not uncommon, either in

separation agreements or in statutes, and they routinely have been construed to envision nothing less than the functional equivalent of a marriage.

Illinois, for example, has a statute allowing for termination of support if the recipient "cohabits with another person on a resident, continuing conjugal basis." Ill.Ann. Stat. ch. 40, ¶ 510(b) (Smith–Hurd 1987 Supp.). The Illinois courts have construed that provision as requiring "a *de facto* husband-wife relationship." *Reeder v. Reeder*, 145 Ill.App.3d 1013, 99 Ill.Dec. 648, 495 N.E.2d 1383, 1385 (1986). See also *In re Support of Halford*, 70 Ill.App.3d 609, 27 Ill.Dec. 168, 388 N.E.2d 1131 (1979). Pennsylvania law denies alimony where the petitioner "has entered into cohabitation with a person of the opposite sex...." Pa. Stat.Ann., tit. 23, § 507 (Purdon 1987 Supp.). A finding of "cohabitation," however, requires that the two people "reside together in the manner of husband and wife, mutually assuming those rights and duties usually attendant upon the marriage relationship." *Miller v. Miller*, 352 Pa.Super. 432, 508 A.2d 550, 554 (1986).

A Utah statute provides for termination upon a showing that the former spouse is "residing with a person of the opposite sex" unless it is established that the relationship "is without any sexual contact." In *Haddow v. Haddow*, 707 P.2d 669, 672 (Utah 1985), the Court construed the "common residence" term as meaning "the sharing of a common abode that both parties consider their principal domicile for more than a temporary or brief period of time" and the "sexual contact" provision as denoting "participation in a relatively permanent sexual relationship akin to that generally existing between husband and wife." See also *Fuller v. Fuller*, 10 Ohio App.3d 253, 461 N.E.2d 1348 (1983); *Knight v. Knight*, 500 So.2d 1113 (Ala.Civ.App. 1986), *cert. denied* 500 So.2d 1113 (Ala. Jan. 30, 1987); *Pugh v. Pugh*, 216 N.J.Super. 421, 524 A.2d 410 (1987); Annot., *Divorced Or Separated Spouse's Living With Member Of Opposite Sex As Affecting Other Spouse's Obligation Of Alimony Or Support Under Separation Agreement*, 47 A.L.R.4th 38, 80–87 (1986); Annot., *Divorc-*

*ed Woman's Subsequent Sexual Relations Or Misconduct As Warranting, Alone Or With Other Circumstances, Modification Of Alimony Decree,* 98 A.L.R.3d 453, 461–67 (1980).

Although there is obviously no single mold into which all marriages (and therefore all "marriage-type relationships") will fit, we think that the term envisions at least the normally accepted attributes of a marriage—a common residence which each party regards as his or her home, a common household to which each contributes, and a personal relationship that is more than casual and has significant meaning to each. These things are measured, of course, by living arrangements, by shared assets and expenses, and by how the parties and the community view their relationship.

The evidence here falls far short of establishing that kind of relationship. There was no common residence; there was no common household; neither Carol, Mr. Weiss, Carol's children, nor the neighbors regarded Carol and Mr. Weiss as having a "marriage-type relationship." At best, the evidence showed two people, in their silver if not golden years, who care for one another, who enjoy each other's company, and who help each other.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.