Argued and submitted November 21, 1995, reversed and remanded with
instructions in part; otherwise affirmed February 14, 1996

## In the Matter of the Marriage of

## Ida M. MORRISON,
*Respondent,*

*and*

## Steven D. MORRISON,
*Appellant.*

## (9010-68379; CA A86412)

910 P2d 1176

Gary J. Zimmer argued the cause for appellant. With him on the brief were Peter Bunch and Kennedy, King & Zimmer.

Mary Ellen Page Farr argued the cause for respondent. With her on the brief were Ted E. Runstein, Dana L. Barnes and Kell, Alterman & Runstein.

Before Edmonds, Presiding Judge, and De Muniz and Armstrong, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

Husband appeals from the trial court's denial of his motion to modify the parties' judgment of dissolution of marriage. He argues that the court erred in refusing to terminate or reduce his spousal support obligation under the judgment and in not requiring wife to compensate him for certain medical expenses that he incurred on behalf of their children. He also appeals from the trial court's award of attorney fees to wife. We review *de novo*, ORS 19.125(3), and terminate the spousal support obligation.

Husband and wife's 22-year marriage was dissolved in September 1993. At that time, wife was employed part time earning about $7,000 per year. Pursuant to a marital settlement agreement incorporated into the judgment of dissolution, husband is required to pay wife $1,500 per month as "permanent spousal support" for the first two years, and $1,000 per month thereafter. The settlement agreement also provides that the support obligation will terminate "upon the death or remarriage of wife." The agreement makes no other provision for termination of spousal support.

In September 1994, a hearing was held on husband's motion to modify the judgment. At the hearing, husband elicited evidence that wife had become romantically involved with Gary Neal in October 1992, after the parties had separated but before their dissolution was final. Except for a three-month hiatus, wife and Neal's relationship had continued up to the time of the hearing. Neal is a senior account manager for a certified public accounting firm. At the time of the hearing, he was obligated to pay spousal and child support to his former wife.

Wife has been cohabiting with Neal since October 1993, when she sold for $285,000 the family home that she had been awarded by the dissolution judgment.[1] Wife and Neal then bought a residence as cotenants for $350,000 and moved into it. Wife provided the entire down payment of $212,000 for the purchase and makes all of the payments on the unpaid balance of the loan out of her personal account.

---

[1] At the time wife sold the home, there was an outstanding mortgage on it for $19,000.

Neal owns a 24-percent interest in the property and, according to his testimony, will share in 24 percent of the appreciation of the property in the event it is sold. He testified that the title company determined the amount of his interest in the home. He said he assumes that the 24-percent interest represents the consideration for assuming coresponsibility for the loan on the house, since wife would have been unable to procure a loan without his becoming a coobligor. Neal earns approximately $54,000 per year and gives wife $800 per month for his "room and board."

Wife now works 30 to 40 hours a week and earns about $13,000 a year from her employment. She also receives about $12,000 per year in income from other real estate that she owns, and $3,700 per year from interest income. Wife and Neal have separate checking accounts and have not otherwise commingled their finances. However, wife permitted Neal to report as a deduction on his 1993 tax return all of the real estate taxes and interest payments she paid in 1993. They also have drafted wills that benefit each other.[2] According to wife's uniform support affidavit, the household expenses, excluding the direct expenses for the parties' children, exceed $2,600.

In December 1993, wife received a diamond sapphire ring from Neal that he purchased for approximately $2,000. Although wife denies being "engaged to be married" to Neal,[3] the evidence suggests otherwise. At the hearing, one witness testified that she saw wife at a Christmas party in December 1993. Wife was wearing the ring at the party and displaying it to the people at the party. The witness testified that "it was understood [from what wife said at the party] that they had — that [wife] had received an engagement ring and she was engaged." When asked if there was discussion about a date for the marriage, the witness said,

---

[2] Neal's will names wife as the sole beneficiary of his interest in their residence. Wife's will devises her interest in the property to her children, but gives Neal the option of buying it from her children.

[3] In response to husband's motion to terminate spousal support on the basis that a "de facto" remarriage had occurred, wife filed an affidavit in August 1994 in which she averred, "We [wife and Neal] are not engaged and we have no intention of marrying. We are simply good friends."

"Well, it was — I think we did ask them that, and the response was that there was no date set."

At the hearing, wife testified in response to husband's counsel's examination.

"Q.  Are you engaged to Mr. Neal?

"A.  Not engaged to be married.

"Q.  Are you engaged in any fashion to Mr. Neal?

"A.  I am committed to a monogamous relationship with Mr. Neal.

"Q.  Have you told friends and family that you are engaged to Mr. Neal?

"A.  I might have used the word 'engaged.'

"* * * * *

"Q.  Your ring finger. You wear it [the ring] on that finger?

"A.  Sometimes I wear it on my left hand, sometimes I wear it on my right hand.

"Q.  Have you told other friends and family that you were engaged?

"A.  I've told people that I've got a ring. I've showed it, and I might have used the words 'engaged,' but not engaged to be married.

"Q.  What does the ring signify to you?

"A.  That — like I said, that we have made a commitment to each other, and we wanted our children to know that we were committed to each other.

"* * * * *

"Q.  Have you had discussions with Mr. Neal about getting married?

"A.  Yes.

"Q.  And have you brought up to him in those discussions your concern about the spousal support being terminated if you remarried?

"A.  Not concern, but I have — talked about that it would be terminated, but not concerned. That's not our concern if we get married.

"* * * * *

"Q. There's no plans to end your living arrangement with Mr. Neal?

"A. No.

"Q. No plans to end your commitment to Mr. Neal? Your monogamous commitment?

"A. No."

Wife also offered testimony that she suffers from emotional difficulties and therefore is not ready for a marital relationship yet.

When Neal was asked about the nature of his relationship with wife, he testified:

"Q. All right. Did you and [wife] attend one or more Christmas parties last Christmas?

"A. Yes.

"Q. At the time of those parties, at one or more of those parties, did you or [wife] indicate that you were engaged?

"* * * * *

"A. Yes.

"Q. Was [wife] wearing the ring that you had bought for her?

"* * * * *

"A. Yes.

"Q. Was she showing the ring to people there at the time that she indicated that you were engaged?

"A. Yes.

"Q. Are you and [wife] engaged to be married?

"A. We're engaged.

"Q. What does that mean to you?

"A. Well, that means that — that we have a promise to be monogamous; that at some point in time in the future we may get married.

"Q. It represents a physical commitment between the two of you to be monogamous?

"A. Yes.

"Q. And it also represents a spiritual commitment between the two of you?

"* * * * *

"A.   Yes.

"Q.   Thank you. You and [wife] have discussed marriage?

"A.   We have.

"Q.   She has brought up to you the fact that a marriage between the two of you would affect her spousal support?

"A.   Yes.

"* * * * *

"Q.   Have you discussed your relationship [with wife] with your children from your former marriage?

"* * * * *

"A.   Yes.

"Q.   Have you told them you were engaged?

"A.   Yes.

"Q.   And have you done that to, in their eyes [to] legitimize the relationship?

"A.   That's correct.

"* * * * *

"Q.   And when you say you've discussed marriage, are you going to get married?

"A.   I would like to think so.

"Q.   When?

"A.   I can't really say — I can't really say.

"Q.   Are you ready to get married?

"A.   Not at this time.

"* * * * *

"Q.   Can you afford to continue to live in that house and own that house if the spousal support is terminated at this time?

"A.   I don't think so."

Husband presents alternative theories in support of his motion for termination or reduction of his spousal support obligation. He asserts that when a marital settlement agreement has a term that provides for termination of

spousal support upon remarriage, that condition is satisfied if the circumstances of the new relationship demonstrate "a relationship that is the emotional and economic equivalent of marriage." Alternatively, he argues that wife's relationship constitutes an unanticipated substantial change of circumstances that permits the court under ORS 107.135(2) to modify or terminate the support obligation. Because husband's latter argument is dispositive, we do not reach the issue of whether the parties contemplated in their agreement that a "de facto" marital relationship would terminate spousal support.

■     A trial court may modify a support obligation because of a substantial change of circumstances different from that contemplated by a settlement agreement. *See Pope and Pope*, 301 Or 42, 46-47, 718 P2d 735 (1986). We have held that, because remarriage may constitute a substantial change of circumstances, a relationship that is the equivalent of marriage may also constitute a substantial change. *Ho and Ho*, 93 Or App 421, 424, 762 P2d 344 (1988). In this case, there is evidence that wife enjoys the emotional and financial benefits of a marital relationship. Wife's testimony that she is not engaged to be married to Neal is simply not credible. Moreover, Neal and wife hold themselves out to their children and to others as having a relationship that is the substantial equivalent of marriage, and they have cohabited for a significant period of time. They have committed themselves to an emotionally and physically monogamous relationship for the indefinite future and have told others that they intend to be married in the future. Although no date for a wedding has been set, wife wears an expensive ring to symbolize their relationship. In addition, they own property jointly and have used the tax benefits flowing from the property in a manner that is inconsistent with tenants in common who have only an arms-length relationship. Even though wife and Neal claim that they are not ready to marry, the entanglements of property coownership and their emotional commitment belie their representations. In substance, they have already undertaken most of the indicia of a formal marital relationship.

It appears that Neal and wife's reluctance to marry is prompted by financial concerns, such as Neal's obligations to his former family and the potential loss of their $350,000 residence. Moreover, we are persuaded that their concerns have prompted them to establish a financial arrangement wherein Neal pays only "room and board." The fact that wife allowed Neal to report the real estate taxes and interest payments as his tax deductions is evidence that wife and Neal share their personal incomes in more ways than a boarder who contributes to household expenses. In effect, husband's spousal support permits Neal and wife to continue the "room and board" arrangement while they enjoy a residence and lifestyle in which even half of the household expenses far exceed Neal's $800 monthly contribution. We believe that that effect is inequitable.

■■ Remarriage or the equivalent of a marital relationship does not automatically result in the termination of a spousal support award. However, it is a circumstance that is to be considered in the light of the reasons for the original award when a motion to terminate spousal support is made. Said another way, "Support should be terminated when the purposes of the initial award have been met." *Bates and Bates*, 303 Or 40, 46, 733 P2d 1363 (1987). At the time of the judgment of dissolution, wife's income from her employment, investments and spousal support approximated $3,200 per month. According to Neal's testimony, his net income after paying his spousal support and child support obligations is $2,900 per month. When that income is combined with wife's current monthly gross income from her wages and investments, the need for spousal support is no longer apparent. We conclude on these facts that husband's spousal support should be terminated.

■ As to the other issues, the unreimbursed medical expenses paid by husband are *de minimis* when offset by the unreimbursed expenses paid by wife. Therefore, we will not alter the trial court's ruling in that regard. Finally, in light of our disposition of husband's motion to terminate his spousal support obligation, we vacate the trial court's award of attorney fees to wife.

Reversed and remanded for entry of judgment terminating husband's spousal support obligation and vacating award of attorney fees; otherwise affirmed. Costs to husband, not including attorney fees.