675 A.2d 540

Sara Jenkins GORDON

v.

**Joel Spencer GORDON.**

**No. 125, Sept. Term, 1994.**

Court of Appeals of Maryland.

April 19, 1996.

Reconsideration Denied May 31, 1996.

Robert Case Liotta (Liotta, Dranitzke & Engel, on brief, Washington, DC), for appellant.

Patricia M. Weaver, Glenn M. Cooper (Paley, Rothman, Goldstein, Rosenberg & Cooper, Chartered, on brief), Bethesda, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RAKER, Justice.

In this case, we are asked to interpret a separation agreement that provides for contractual spousal support. We are specifically asked to construe a clause of the agreement that terminates the husband's obligation to pay support if "the wife resides with any unrelated man without the benefit of marriage for a period continuing for beyond sixty (60) consecutive days." Based on our interpretation of the clause, we conclude that this language requires the husband to demonstrate that the wife established a cohabitation arrangement before he may terminate support. Because the trial court and the Domestic Relations Master erroneously interpreted the agreement, we shall remand the case to determine if the wife established a cohabitation arrangement.

## I.

On December 26, 1990, the Circuit Court for Montgomery County granted an absolute divorce to Sara and Joel Gordon. The court entered a Judgment of Absolute Divorce, which "incorporated but did not merge" the parties' separation agreement. The agreement included a support provision, which provided in pertinent part that:

Husband shall pay to Wife as alimony the sum of $6,000 per month in advance, commencing on the first day of Decem-

ber, and continuing on the first day of each and every month thereafter. The said payments shall terminate upon the death of the Husband, the death of the Wife, the remarriage of the Wife, or at such time as the Wife reaches the age of 59 1/2, whichever first occurs. *The said payments shall also terminate in the event the Wife resides with any unrelated man without the benefit of marriage for a period continuing for beyond sixty (60) consecutive days.* (emphasis added).[1] Mrs. Gordon's attorney drafted the last sentence of the support provision, which we shall term the "cohabitation clause." [2]

Mr. Gordon paid support to Mrs. Gordon as provided in the separation agreement from the time of the divorce until the present dispute arose in 1993. In February of 1993, Mr. Gordon began to drive by Mrs. Gordon's home regularly to see if a car belonging to William Shankland was parked near the house in the morning. Mr. Gordon testified that he frequently observed Mr. Shankland's car parked near the home. Sus-

---

1. The separation agreement also stated that:
 Alimony shall be modifiable only downward by a court (except for cost of living adjustments as hereafter set forth), no court shall have the power to modify alimony upward, and in no event shall any court have the power to modify the duration of alimony to extend beyond the times set forth herein.
 We point out that we do not address the issue of whether the court may modify the spousal support provision. Neither Mr. Gordon nor Mrs. Gordon requested modification, and neither party briefed or argued the issue. We leave for another day the question of whether a separation agreement containing language similar to the agreement in this case may be modified by the court. *See* Md.Code (1984, 1991 Repl.Vol., 1995 Cum.Supp.) §§ 8–103, 8–105(b), and 11–107(b) of the Family Law Article. *See also* S. Sharp, *Semantics as Jurisprudence: The Elevation of Form Over Substance in the Treatment of Separation Agreements in North Carolina,* 69 N.C. L. Rev. 319, 322 (1991) (examining the "[c]onsiderable tension ... between movement toward greater freedom of contract and the traditional, and not unreasonable, public policy interest that states retain in regulating some of the incidents of divorce."). *See also Langley v. Langley,* 88 Md.App. 535, 596 A.2d 89 (1991).

2. Although the parties did not use the word "cohabitation" in the agreement, we shall explain, *infra,* that the words "resides ... without the benefit of marriage" are, in this context, synonymous with the term "cohabitation." *See infra* Section IV and note 6.

pecting that Mrs. Gordon was residing with Mr. Shankland in violation of the separation agreement, Mr. Gordon engaged a private investigator to conduct surveillance of Mrs. Gordon's house. The surveillance began on April 16, 1993, and continued through July 23, 1993. In a letter dated July 25, 1993, Mr. Gordon informed Mrs. Gordon that he would cease paying support because she had violated the support clause of the agreement.

Mr. Gordon filed a petition in the Circuit Court for Montgomery County, requesting that the court confirm his termination of alimony, and that the court order Mrs. Gordon to repay alimony received since she began living with Mr. Shankland in violation of the clause. The court referred the case to a Domestic Relations Master for an evidentiary hearing, pursuant to Maryland Rules 2–541 and S74A. At the hearing, Mr. Gordon presented evidence suggesting that Mr. Shankland had no residence other than Mrs. Gordon's home for a period of more than sixty days. In addition, he presented evidence that Mr. Shankland used Mrs. Gordon's phone number as his own on a community theater group phone list. He also introduced checks from Mr. Shankland to Mrs. Gordon totalling nearly $12,000.

In response, Mrs. Gordon testified that Mr. Shankland maintained a separate residence at all times. She explained that Mr. Shankland used her phone number on the community theater group cast list to avoid harassing phone calls from his ex-wife. She also testified that she and Mr. Shankland did not share expenses, and that the checks presented by Mr. Gordon represented Mr. Shankland's share of expenses for joint vacations, as well as repayment of loans with interest. Mrs. Gordon did not call any other witnesses to testify on her behalf.[3]

---

**3.** Although other witnesses were available, including Mr. Shankland, they were not called to testify by either party. The Domestic Relations Master drew the negative inference that the missing but available witnesses would have provided adverse testimony to Mrs. Gordon's case. Although Mrs. Gordon filed an exception regarding the Master's

At the conclusion of the hearing, the Master found that Mr. Gordon had established that Mr. Shankland had no residence other than Mrs. Gordon's home for more than sixty days. She therefore concluded that Mrs. Gordon had resided with an unrelated male for more than sixty consecutive days in violation of the agreement. As a result, she recommended that the court confirm Mr. Gordon's termination of support payments to his ex-wife. The Master made no other findings regarding the relationship between Mrs. Gordon and Mr. Shankland.

Mrs. Gordon filed exceptions to the Master's Report, contesting the Master's interpretation of the contract, the sufficiency of the evidence to support the Master's findings, and the Master's application of the "missing witness" rule. The Circuit Court for Montgomery County heard oral argument on the exceptions on May 2, 1994. The court overruled the exceptions, but *sua sponte* requested that the parties brief and argue the issue of whether public policy precluded enforcement of the support clause.

After oral argument of the public policy issue, the court concluded that the agreement was not contrary to public policy, and entered an order terminating Mr. Gordon's support obligation. Mrs. Gordon noted a timely appeal to the Court of Special Appeals. We issued a writ of certiorari on our own motion prior to consideration of the case by the intermediate appellate court.

## II.

The Appellant, Sara Gordon, contends that the Domestic Relations Master's finding that she had violated the terms of the separation agreement was not supported by sufficient evidence. In addition, the Appellant argues that the support provision of the agreement should be interpreted to require Mr. Gordon to demonstrate that her economic circumstances changed as a result of sharing her residence with Mr. Shank-

application of the "missing witness rule," she did not raise the issue on appeal.

land before he may terminate support. She urges this Court to "heed the trend of courts across the country, who acknowledge increasingly that alimony modifications should, as a matter of law and in the absence of the parties' clear and unequivocal intent to the contrary, arise from changed economic circumstances, and not from punitive motives." (Appellant's Brief at 29).

The Appellee, Joel Gordon, contends that the evidence supported the Domestic Relations Master's finding that Mrs. Gordon violated the parties' agreement. He argues that once he presented *prima facie* evidence that the Appellant had violated the support agreement, the burden to rebut the evidence shifted back to the Appellant, and she failed to meet this burden. The Appellee also argues that the language of the support provision is unambiguous, and does not require proof of changed economic circumstances. Furthermore, Appellee argues that even if the support provision is interpreted to include an economic component, the proof offered established that Appellant cohabited with Mr. Shankland in violation of the agreement.

## III.

Maryland has long recognized and enforced spousal support agreements. *See, e.g., Weiss v. Melnicove,* 218 Md. 571, 147 A.2d 763 (1959); *Dickey v. Dickey,* 154 Md. 675, 141 A. 387 (1928). Although contracts between husbands and wives made in contemplation of divorce were traditionally considered unenforceable, parties are now explicitly authorized to enter agreements regarding support and property settlement by Maryland Code (1984, 1991 Repl.Vol., 1995 Cum.Supp.) § 8–101 of the Family Law Article.[4] The prevail-

---

4. Cases prior to the turn of the century suggested that parties ordinarily could not contract for spousal support in lieu of alimony. For example, in *Kremelberg v. Kremelberg,* 52 Md. 553 (1879), we stated:

> It is hardly necessary to say, that both courts of law and equity have uniformly refused to recognize the validity of voluntary deeds of separation, so far as they undertake to release the parties from the

ing view is now that "separation agreements . . . are generally favored by the courts as a peaceful means of terminating marital strife and discord so long as they are not contrary to public policy." 5 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 11:7, at 396–99 (R. Lord ed., 4th ed.1993). *See also* RESTATEMENT (SECOND) OF CONTRACTS § 190 (1979) (Illustration 2).[5]

Spousal support agreements frequently include provisions terminating support if the spouse receiving support enters a cohabitation arrangement. *See, e.g.,* A. TURNBULL & J. WASE, MARYLAND DOMESTIC RELATIONS FORMS 256 (1989 & 1995 Supp.) (Form 14.3.9). These provisions take a variety of forms.

One common approach is to define remarriage, which typically terminates the support obligation, to encompass cohabitation. For example, one form provision states that:

> duties and obligations resulting from the marriage contract. This the parties have no power to do. . . . Any private understanding or agreement, . . . between husband and wife to live separate, is not recognized by law.
> *Id.* at 563. *See also Wallingsford v. Wallingsford,* 6 H. & J. 485, 489 (1823) ("[w]hether an agreement for a separate maintenance will be enforced, where such agreement rests in articles between the husband and wife, appears not to be settled[.]").
> Subsequently in *Emerson v. Emerson,* 120 Md. 584, 87 A. 1033 (1913), we suggested that although separation agreements were disfavored, they could be incorporated in divorce decrees if the court approved their terms. *Id.* at 597, 87 A. at 1038. We stated:
> The law has generally regarded all agreements, made during the pending of the suit for divorce, as void, as being against public policy. Too easy is it for the parties to come to such an arrangement on property division as to amount to collusion on the question of the divorce itself. The practice is common, nevertheless, for Courts to incorporate in their decrees provisions as to alimony which have been agreed to by the parties. The Court, however, must be satisfied that the agreement is not the result of collusion on the main point of the divorce. The practice is to submit the agreement to the Court, and if the Court is satisfied that it is a proper settlement, it will receive the sanction of a decree.
> *Id.* at 596–97, 87 A. at 1038.

**5.** *See generally* S. Sharp, *Fairness Standards and Separation Agreements: A Word of Caution on Contractual Freedom,* 132 U. PA. L. REV. 1399 (1984).

For the purposes of this agreement the term "remarriage of the Wife" shall be defined as either a ceremonial civil or religious marriage *or a situation whereby the wife habitually and continuously resides with another man without benefit of a marriage ceremony for a period of 120 days consecutively or 120 days cumulatively within a sixteen-month period.*

S. SCHLISSEL, 2 SEPARATION AGREEMENTS AND MARITAL CONTRACTS § 19.28, at 511 (1986 & 1992 Cum.Supp.). As the treatise author notes, frequently "[p]roblems arise with use of words such as 'habitually' and 'continuously.' " *Id.* at 512.

Other form agreements treat cohabitation as a separate basis for termination of support, independent of remarriage. For example, one such provision states that:

(A) The [*payor*] shall pay to the [*payee*], for his [*or* her] support, maintenance, or alimony, the sum of _____ dollars per week, until the death of either party, or the remarriage of the [*payee*], or the (*payee's*) cohabitation with another person, whichever event shall first occur.

(B) For the purposes of this Agreement, the term "cohabitation" includes *any shared occupancy of a dwelling, whether or not the occupants engage in sexual relations.*

A. LINDEY & L. PARLEY, 1 LINDEY ON SEPARATION AGREEMENTS AND ANTENUPTIAL CONTRACTS 15A–6 (1995) (Form 15A.05) (emphasis added). *See also* S. GREEN & J. LONG, MARRIAGE AND FAMILY LAW AGREEMENTS 372–73 (1984 & 1994 Cum.Supp.) (Appendix 3) ("[Support] shall continue until . . . the death of the [h]usband, the death of the Wife, her remarriage, or her cohabitation with another person with whom she has a romantic relationship.").

Some form agreements state the term "cohabitation" without additional explanation, while others further define or restrict the term in some fashion. For example, some provisions require a financial relationship between the cohabitants as a condition for terminating support. One provision states that:

The Wife shall also be deemed to have remarried for the purpose of this Article if she shall live with an unrelated adult male to whom she is not legally married in the same abode in a situation where the parties are, in effect, living as Husband and Wife and the unrelated adult male should be supporting, or contributing to the support, of the Wife.

SCHLISSEL, *supra*, § 19.31, at 513.

Other form agreements require common residence for a specific length of time to establish cohabitation. The interval of continuous residence required to establish cohabitation varies, ranging from 30 to 180 days. *See, e.g., id.* §§ 19.28, 19.30, at 511–12; TURNBULL & WASE, *supra*, at 256 ("remarriage shall be defined so as to include her cohabitation or residing with an unrelated male for either thirty (30) consecutive days or ninety (90) days in any one hundred eighty (180) day period.").

■ Because form agreements typically use the term "cohabitation" or an analogous term, interpretation of these provisions turns on the definition of "cohabitation." [6] Ordi-

---

6. Parties may elect to use a variety of terms other than "cohabitation" to describe the type of relationship they contemplate. For example, in *Fisher v. Fisher*, 75 Md.App. 193, 540 A.2d 1165 (1988), *cert. denied*, 313 Md. 30, 542 A.2d 857 (1988), the Court of Special Appeals interpreted a separation agreement that provided for termination of alimony if the wife remarried or entered into a "marriage-type arrangement." Although the agreement used the term "marriage-type arrangement" rather than "cohabitation," the Court of Special Appeals used other jurisdictions' definitions of "cohabitation" to determine the meaning of "marriage-type arrangement." *Id.* at 200–02, 540 A.2d at 1168–69. *Accord Frey v. Frey*, 14 Va.App. 270, 416 S.E.2d 40, 43 (1992) ("The language, 'cohabitation, analogous to a marriage,' as used in the ... agreement ... like the phrase, 'marriage-type arrangement,' has been consistently interpreted by courts as encompassing both a permanency or continuity element and an assumption of marital duties[.]") (citing *Fisher* with approval). *See also Bell v. Bell*, 393 Mass. 20, 468 N.E.2d 859, 860 (1984) (agreement provided that support would terminate if the wife was "living together with a member of the opposite sex, so as to give the outward appearance of marriage"), *cert. denied*, 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 782 (1985); *In re Marriage of Winningstad and Winningstad*, 99 Or.App. 682, 784 P.2d 101, 102–03 (1989) (support to terminate if wife "enter[ed] into a relationship with a male substantially similar to a marital relationship"); *Kenyon v. Ken-*

narily, "[t]he common or normal meaning of language will be given to the words of a contract unless the circumstances show that in a particular case a special meaning should be attached to it." 4 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 618, at 705 (W. Jaeger ed., 3d ed. 1961 & 1995 Cum.Supp.). The dictionary definition of "cohabitation," together with the factors that have been developed by the courts to explain the definition, constitute its ordinary meaning. We shall interpret "cohabitation" according to the ordinary meaning unless the parties indicate additional requirements or an alternative definition.

■ WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY defines "cohabit" as "to live together as husband and wife usually without a legal marriage having been performed." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 440 (P. Gove ed., 1963). Similarly, BLACK'S LAW DICTIONARY defines "cohabitation" as "[t]o live together as husband and wife. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations." BLACK'S LAW DICTIONARY 260 (6th ed.1990) (citations omitted). Courts have developed a number of factors to consider in determining whether two parties "live together as man and wife." *See In re Marriage of Desler,* 56 Or.App. 812, 643 P.2d 655, 658 (1982). The determination of whether an arrangement constitutes "cohabitation" is a factual issue to be decided on the specific facts of each case. *In re Marriage of Edwards,* 73 Or.App. 272, 698 P.2d 542, 546 (1985).

---

yon, 496 So.2d 839, 840 (Fla.Dist.Ct.App.1986) (support to terminate upon wife "permanently residing with a nonrelated adult male"), *cert. denied,* 506 So.2d 1042 (Fla.1987); *Brown v. Brown,* 122 Misc.2d 849, 472 N.Y.S.2d 550, 551 (1984) (parties stipulated that support would terminate if the wife "lives with another man"), *modified on other grounds,* 122 A.D.2d 762, 505 N.Y.S.2d 648 (2d Dep't 1986), *appeal dismissed without op.* 68 N.Y.2d 910, 508 N.Y.S.2d 1030, 501 N.E.2d 603 (1986), and *appeal dismissed,* 70 N.Y.2d 763, 520 N.Y.S.2d 750, 514 N.E.2d 1374 (1987); *see also In re Marriage of Desler,* 56 Or.App. 812, 643 P.2d 655 (1982).

While we have not previously detailed the factors characterizing a cohabitation arrangement, the Court of Special Appeals considered a similar issue in *Fisher v. Fisher*, 75 Md.App. 193, 540 A.2d 1165 (1988), *cert. denied*, 313 Md. 30, 542 A.2d 857 (1988). In *Fisher*, the intermediate appellate court interpreted a separation agreement providing for termination of spousal support if the wife "remarried or enter[ed] into a marriage-type arrangement." *Id.* at 195, 540 A.2d at 1166. Chief Judge Wilner, writing for the Court, observed that:

Although there is obviously no single mold into which all marriages (and therefore all "marriage-type relationships") will fit, we think that the term envisions at least the normally accepted attributes of a marriage—a common residence which each party regards as his or her home, *a common household to which each contributes*, and a personal relationship that is more than casual and has significant meaning to each. These things are measured, of course, by living arrangements, by *shared assets and expenses*, and by how the parties and the community view their relationship.

*Id.* at 202, 540 A.2d at 1169 (emphasis added). *Accord Salas v. Salas*, 128 A.D.2d 849, 513 N.Y.S.2d 770, 772 (1987) (holding that wife was not "living together" with an unrelated male, triggering termination of support, in part because the two had not formed an "economic unit"), *appeal dismissed without op.*, 70 N.Y.2d 747, 519 N.Y.S.2d 1033, 514 N.E.2d 391 (1987).

Courts in other jurisdictions have developed similar characteristics to determine whether parties have established a cohabitation relationship. For example, in *Beck v. Beck*, 286 Ala. 692, 246 So.2d 420 (1971), the Alabama Supreme Court stated:

We think cohabitation as that word is used in our cases encompasses many factors which are necessarily involved when a man and a woman dwell together as man and wife. We think it may or may not, under the circumstances of the particular case, include sexual activity, but it does include such things as eating together, sharing household duties, payment of household expenses, holding themselves out to

the public as man and wife, and all of the numerous aspects of day-to-day mutual existence of married persons.

*Id.*, 246 So.2d at 428. More recently, in *State v. Kellogg*, 542 N.W.2d 514 (1996), the Iowa Supreme Court approved six factors for courts to consider in determining whether a couple is cohabiting [7]:

1. Sexual relations between the parties while sharing the same living quarters.

2. Sharing of income or expenses.

3. Joint use or ownership of property.

4. Whether the parties hold themselves out as husband and wife.

5. The continuity of the relationship.

6. The length of the relationship.

*Id.* at 518 (citing *People v. Holifield*, 205 Cal.App.3d 993, 252 Cal.Rptr. 729, 734 (1988)).[8]

---

7. In Iowa, domestic abuse assault is a misdemeanor. Iowa Code §§ 708.2A (1995).

8. Many other courts have similarly interpreted "cohabitation" to require mutual assumption of marital obligations, not merely a shared residence and a sexual relationship. *See, e.g., Cook v. Cook*, 798 S.W.2d 955, 957 (Ky.1990); *In re Marriage of Gibson*, 320 N.W.2d 822, 824 (Iowa 1982); *State v. Arroyo*, 181 Conn. 426, 435 A.2d 967, 970 (1980) ("Cohabitation ... includes many facets of married life in addition to sexual relations. It is the mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations."); *Dudley v. Dudley*, 225 N.C. 83, 33 S.E.2d 489, 490 (1945); *Snipes v. Snipes*, 651 So.2d 19, 20 (Ala.Civ.App.1994); *Perri v. Perri*, 79 Ohio App.3d 845, 608 N.E.2d 790, 794 (1992), *stay denied*, 64 Ohio St.3d 1426, 594 N.E.2d 968 (1992), *and dismissed, mot. overruled*, 65 Ohio St.3d 1430, 600 N.E.2d 675 (1992); *Salas v. Salas*, 128 A.D.2d 849, 513 N.Y.S.2d 770, 772 (1987), *appeal dismissed without op.*, 70 N.Y.2d 747, 519 N.Y.S.2d 1033, 514 N.E.2d 391 (1987); *In re Marriage of Wessling*, 12 Kan. App.2d 428, 747 P.2d 187, 190 (1987); *In re Marriage of Edwards*, 73 Or.App. 272, 698 P.2d 542, 547 (1985); *Fuller v. Fuller*, 10 Ohio App.3d 253, 461 N.E.2d 1348, 1349 (1983); *In re Marriage of Molloy*, 635 P.2d 928, 929–30 (Colo.Ct.App.1981); *Melletz v. Melletz*, 271 N.J.Super. 359, 638 A.2d 898 (1994), *cert. denied*, 137 N.J. 307, 645 A.2d 136 (1994); *Hurley v. Hurley*, 230 N.J.Super. 493, 553 A.2d 891, 892–93 (1988); *Miller v. Miller*, 352 Pa.Super. 432, 508 A.2d 550, 554–55 (1986).

Even courts that have not required proof of a financial relationship to establish cohabitation have acknowledged that shared finances are persuasive evidence of cohabitation. *See, e.g., Haddow v. Haddow,* 707 P.2d 669, 673 (Utah 1985). For example, the Utah Supreme Court has stated that:

> Our review of out-of-state case law discloses that in some jurisdictions a third element, shared living expenses, is either an essential ingredient of cohabitation ... or evidence of it.... Although we do not consider the sharing of the financial obligations surrounding the maintenance of a household to be a requisite element of cohabitation, we do find it significant that [the alleged cohabitant] did not pay any of appellant's living expenses or consistently share with her any of his assets.... His occasional payments to appellant ... *were reimbursements and evidence an intent to bear his own expenses, not an intent to contribute to appellant's household.*

*Id.* at 673–74. *See also Frey v. Frey,* 14 Va.App. 270, 416 S.E.2d 40, 43 (1992) ("[W]e hold that the phrase, 'cohabitation, analogous to a marriage,' means a status in which a man and woman live together continuously, or with some permanency, mutually assuming duties and obligations normally attendant with a marital relationship. It involves more than living together for a period of time and having sexual relations...."); *In re Marriage of Edwards,* 73 Or.App. 272, 698 P.2d 542, 547 (1985).[9]

---

9. In *Edwards,* the Oregon Court of Appeals concluded that:

 '[C]ohabitation' ... refers to a domestic arrangement between a man and woman who are not married to each other, but who live as husband and wife, in that, for more than a brief period of time, they share a common domicile and living expenses and are sexually intimate. Although some economic consequence is inevitable from such a relationship, we decline to adopt wife's suggestion that financial benefit to the supported spouse that *permanently* affects the need for the decreed spousal support is a prerequisite to a finding of cohabitation. Cohabitation, like remarriage, may result in a decreased or increased standard of living and may endure for only a limited period, but those factors do not determine the existence of the underlying relationship.

 73 Or.App. 272, 698 P.2d at 547 (emphasis added).

**308**

 We conclude that the term "cohabitation" implies more than merely a common residence or a sexual relationship. We believe the ordinary definition of "cohabitation," describing a relationship of living together "as man and wife," connotes mutual assumption of the duties and obligations associated with marriage. To guide trial courts in applying this definition, we have formulated a list of factors to consider in determining whether a relationship constitutes cohabitation. We emphasize, however, that the list is non-exhaustive, and that no one factor serves as an absolute prerequisite for cohabitation. In interpreting "cohabitation," courts may consider indicia such as:

1. establishment of a common residence; [10]
2. long-term intimate or romantic involvement; [11]

---

**10.** As a number of courts have observed, common residence is not established merely by time spent together, but rather, requires that both parties treat the residence as their home. In determining whether a party is actually a co-resident or merely a long-term guest, courts have considered whether the visitor may enter the residence when the other party is not at home, whether the visitor has his or her own key, and whether the visitor shares household expenses. For example, in *In re Marriage of Gibson*, 320 N.W.2d 822 (Iowa 1982), the Iowa Supreme Court stated that:

> The time petitioner's boyfriend spent in the dwelling was extensive, easily sufficient to qualify as residence if time alone controlled. But the time was not spent as a resident. He maintained a separate residence and shared none of the expenses of this one. He did not even have a key or the freedom to enter it except when petitioner was present. In simple terms he did not live there.

*Id.* at 824. *See also Salas v. Salas*, 128 A.D.2d 849, 513 N.Y.S.2d 770, 772 (1987), *appeal dismissed without op.*, 70 N.Y.2d 747, 519 N.Y.S.2d 1033, 514 N.E.2d 391 (1987).

**11.** We use the term "intimate or romantic relationship" rather than sexual relationship because we do not believe sexual relations are a prerequisite for cohabitation. As the Ohio Court of Appeals stated in *Perri v. Perri*, 79 Ohio App.3d 845, 608 N.E.2d 790 (1992), *stay denied*, 64 Ohio St.3d 1426, 594 N.E.2d 968 (1992), *and dismissed, mot. overruled*, 65 Ohio St.3d 1430, 600 N.E.2d 675 (1992):

> [T]he germane issue before the trial court was whether the gentleman in question, by voluntarily undertaking certain aspects of a continuing relationship with the plaintiff, thereby assumed obligations equivalent to those arising from a ceremonial marriage. A sexual relationship, since it customarily follows any such undertaking, would be

3. shared assets or common bank accounts;

4. joint contribution to household expenses; and [12]

5. recognition of the relationship by the community.

The factfinder should review these factors and any other relevant evidence in determining whether parties have established a cohabitation relationship. *See In re Marriage of Wessling,* 12 Kan.App.2d 428, 747 P.2d 187, 190–91 (1987). *Cf. Frey,* 14 Va.App. 270, 416 S.E.2d at 43–44.

Contrary to the view of some courts, we do not interpret "cohabitation" to require the couple to hold themselves out as spouses. *Compare Sitarek v. Sitarek,* 179 A.D.2d 1064, 579 N.Y.S.2d 522, 523 (1992) (under § 248 of New York's Domestic Relations Laws, must show parties are holding themselves out as man and wife to establish cohabitation). We include the fifth factor, recognition of the relationship by the community, however, to address situations where parties have celebrated an unofficial marriage ceremony, wear wedding rings, use each others' names, or otherwise indicate to the community that they are married. Under these circumstances, if the ex-spouse and the cohabitant share expenses, the ex-spouse collects support from two sources. Alternately, if the cohabitant does not pay a fair share of the household expenses, then

---

strong evidence of his having done so, but neither it nor its absence would necessarily be *dispositive* of the issue. As marriage partners may mutually consent to a cessation of a sexual relationship, or as age or illness may render its practice impossible, all without disturbing the obligations of the contract, so too may it be the case with cohabitation. Sexual intercourse, in short, is not the *sine qua non* of the 'cohabitation'. . . .

*Id.* 608 N.E.2d at 794 (quoting *Taylor v. Taylor,* 11 Ohio App.3d 279, 280–81, 465 N.E.2d 476, 477–78 (1983)). *See also Beck v. Beck,* 286 Ala. 692, 701, 246 So.2d 420, 428 (1971).

**12.** Because, as we have stated, no one factor is an absolute prerequisite for cohabitation, we need not define the level of financial contribution necessary to demonstrate cohabitation. We observe, however, that we do not believe the party seeking to prove cohabitation must establish that the financial component of the relationship is permanent. *See In re Marriage of Edwards,* 73 Or.App. 272, 698 P.2d 542, 547 (1985).

**310**

it follows that part of the support payment supports the cohabitant rather than the ex-spouse. In either situation, we believe it would be inequitable to require the spouse paying support to continue payment despite the cohabiting parties' *de facto* remarriage. *See, e.g., Weseman v. Weseman,* 51 Or.App. 675, 626 P.2d 942, 944 (1981), *cert. denied,* 291 Or. 118, 631 P.2d 341 (1981); *Miller v. Miller,* 352 Pa.Super. 432, 508 A.2d 550, 554 (1986).[13] *See also In re Marriage of Morrison & Morrison,* 139 Or.App. 137, 910 P.2d 1176, 1179 (1996).

Parties may alter the definition of cohabitation if they choose, subject to the limitations of law and public policy. *See Md. Nat'l Cap. P. & P. v. Wash. Nat'l Arena,* 282 Md. 588, 605–06, 386 A.2d 1216, 1228 (1978); *see also* 4 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS §§ 615, 615A, at 597–599, 630–631 (W. Jaeger ed., 3d ed. 1961 & 1995 Cum.Supp.). Ordinarily, however, we shall assign each word its usual meaning "unless the circumstances show that in a particular case a special meaning should be attached." *Id.* § 618, at 705. Thus, if the parties to a separation agreement use the term "cohabitation" or an analogous term, we shall interpret its meaning according to the definition outlined above absent evidence of an intent to use a different meaning.

---

**13.** In *Weseman,* the former spouses had entered a separation agreement that gave the wife the marital residence, but required her to pay her ex-husband $10,000, his share of the equity in the home, if she remarried or sold the property. Three months after the divorce, the wife informed her ex-husband by letter that she intended to remarry. Subsequently, however, she wrote him another letter indicating she would not be remarried because of the required $10,000 payment. Instead, the wife's new partner moved into her home, and the two "participated in a ceremony in which a local minister pronounced a blessing on the couple." *Id.* 626 P.2d at 943. The two also shared household expenses and owned a car jointly. *Id.* Based on this arrangement, the court determined that: "To allow this defendant and her new domestic associate, by subterfuge, to enjoy the benefits of the former family home while evading the intended financial consequences, is grossly inequitable." *Id.* 626 P.2d at 944. The court therefore concluded that "remarriage," as used in the separation agreement, included arrangements such as the couple's "blessed cohabitation." Therefore, the wife was required to pay her ex-husband $10,000 although she had not technically remarried. *Id.*

## IV.

We shall next apply the principles outlined above to interpret the language of the separation agreement. Specifically, we must determine whether the agreement requires Mr. Gordon to prove that Mrs. Gordon established a cohabitation arrangement with Mr. Shankland. The operative language we must construe is the phrase "resides with any unrelated man without the benefit of marriage for a period continuing for beyond sixty (60) consecutive days."

We shall read this provision so that no part of it is redundant or meaningless. We interpret the phrase "resides with any unrelated man without the benefit of marriage" as a synonym for cohabitation. *Compare Fisher v. Fisher*, 75 Md.App. 193, 200, 540 A.2d 1165, 1168–69 (1988), *cert. denied*, 313 Md. 30, 542 A.2d 857 (1988). If the clause was intended to encompass all situations where Mrs. Gordon resided with an unrelated male, including, *e.g.*, roommates and boarders, the phrase "without the benefit of marriage" would be redundant with "unrelated." *Cf. In re Marriage of Molloy*, 635 P.2d 928, 929–30 (Colo.Ct.App.1981) (wife's male roommate not considered a cohabitant). Therefore, we interpret the phrase "resides with any unrelated man without the benefit of marriage" to mean cohabitation. *See Frey v. Frey*, 14 Va.App. 270, 416 S.E.2d 40, 43 (1992).

Because we find that the parties have used a term synonymous with cohabitation in their agreement, we shall interpret the agreement to incorporate the ordinary meaning of "cohabitation," absent indications to the contrary. 4 S. Williston, A Treatise on the Law of Contracts § 618, at 705 (W. Jaeger ed., 3d ed. 1961 & 1995 Cum.Supp.). In this case, the parties used the phrase "resides with any unrelated man without the benefit of marriage for a period continuing for beyond sixty (60) consecutive days." We interpret this language to indicate that the parties modified the definition of the type of cohabitation arrangement that would terminate support to include an additional element beyond the characteristics we outlined in

Section IV, *supra.* The parties in this case elected to specify the amount of time a relationship must persist to constitute cohabitation. Parties commonly elect to specify a minimum interval of time to establish cohabitation in support agreements, *See, e.g.,* TURNBULL & WASE, *supra,* at 256, because while courts have generally considered the length or permanency of the relationship in evaluating cohabitation, *e.g., Fisher v. Fisher,* 75 Md.App. 193, 202, 540 A.2d 1165, 1169 (1988), *cert. denied,* 313 Md. 30, 542 A.2d 857 (1988); *State v. Kellogg,* 542 N.W.2d 514, 518 (Iowa 1996), the ordinary meaning of the term does not include any specific time component. The parties did not indicate that time was the only element to be considered in evaluating cohabitation, and thus, we interpret the provision to incorporate the ordinary meaning of the term "cohabitation," in addition to the sixty-day time requirement.

We therefore conclude that by using the term "resides with any unrelated man without the benefit of marriage for a period continuing for beyond sixty (60) consecutive days," the parties encompassed cohabitation arrangements, as defined above, that persist for at least sixty days. In this case, the Domestic Relations Master made no findings regarding any indicia of cohabitation other than the sixty-day time requirement.[14] Therefore, from the record, it is clear that the

---

**14.** The Domestic Relations Master's Findings of Fact provided, in pertinent part, that:

2. William Shankland was not a resident of 7521 Spring Lake Drive, D–2, Bethesda, Maryland. He was a guarantor from the inception of the lease until his daughter and her husband vacated the property.

\* \* \*

5. *William Shankland had no residence other than the defendant's from February 15, 1993, to June 30, 1993.*

William Shankland gave the defendant's phone number as his own. . . . The defendant's testimony that William Shankland used defendant's phone number instead of the number of the residence he purportedly was sharing with [his] . . . daughter to prevent his former wife from harassing him is ludicrous.

There was also testimony from Joan Rose, property manager for 7521 Spring Lake Drive, Apartment D–2, that she reached William Shankland through the defendant's phone number, . . . , and that William Shankland was not a tenant at 7521 Spring Lake Drive, Apt. D–2.

Domestic Relations Master erroneously interpreted the provision to require only proof of a common residence for sixty days. While common residence is a significant factor in establishing cohabitation, it is not dispositive. As the Oregon Supreme Court has stated in a different context, "the nature of the relationship and not the number of days spent in the same location determines whether cohabitation exists...." *Cottrell v. EBI Cos.*, 304 Or. 187, 743 P.2d 716, 718 (1987) (quoting *Bowlin v. SAIF*, 81 Or.App. 527, 726 P.2d 1186, 1188 (1986)).

Our interpretation of the parties' cohabitation provision is also supported by the principle that we should read the contract as a whole. In this case, the contract includes a provision specifying that the parties will lead "separate lives," refraining from interference with each other. If the cohabitation clause was interpreted to apply based solely on Mrs. Gordon's common residence with another man, this might be inconsistent with the "separate lives" clause, because it would enable Mr. Gordon to exercise inappropriate control over Mrs. Gordon's post-divorce relationships and sexual conduct. As the parties agreed by incorporating the "separate lives" clause, "[m]atters of personal preference, residence, or occupation, *insofar as they do not reflect changes in income or expenses or other matter of recognized mutual concern,* simply are not the business of a former spouse." *Melletz v. Melletz,* 271 N.J.Super. 359, 366, 638 A.2d 898, 902 (1994) (footnote omitted) (emphasis added), *cert. denied,* 137 N.J. 307, 645 A.2d 136 (1994). Reading the two clauses together supports the view that the cohabitation clause requires more than merely common residence.

In addition, cohabitation is only one of a number of conditions in the agreement triggering termination of support. The agreement also provides that support will terminate in the event of the death of either party, remarriage of the wife, or the wife's reaching retirement age. Each of these conditions

(emphasis added).

bears a significant relationship to the parties' economic circumstances. The agreement also includes a cost of living adjustment to cope with changes in financial circumstance due to inflation. Viewing the agreement in its entirety, therefore, the parties appear to have structured the support payments to respond to changed economic conditions. *See Collier v. MD–Individual Practice*, 327 Md. 1, 5, 607 A.2d 537, 539 (1992) (citing *Pacific Indem. v. Interstate Fire & Cas.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985)).

Furthermore, although the trial judge recognized the potential public policy implications of the cohabitation clause, he limited his inquiry to whether the cohabitation clause was void as contrary to public policy. Because neither the Master nor the trial court interpreted the clause to require evidence of cohabitation, we shall reverse the Circuit Court's decision and remand the case for further proceedings consistent with this opinion.

*JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY THE APPELLEE.*