■ CAMILLE SALAS, Appellant, v ANTHONY SALAS, Respondent.—In a matrimonial action in which the parties were

divorced by judgment dated April 11, 1983, the plaintiff wife appeals from an order of the Supreme Court, Suffolk County (Jones, J.), entered December 3, 1984, which, after a hearing, granted the defendant husband's renewed motion for an order suspending his obligation to make maintenance payments and directing the sale of the former marital residence, and which denied her cross motion for a money judgment against the defendant for arrears of maintenance, an income deduction order and counsel fees.

Ordered that the order is reversed, on the law and the facts, with costs, the defendant's motion is denied and the plaintiff's cross motion is granted, and the matter is remitted to the Supreme Court, Suffolk County, to fix the amount of arrears and counsel fees to be awarded to the plaintiff and to set the terms of the income deduction order pursuant to CPLR 5241 (g) and 5242.

The parties herein were married on June 24, 1967. In 1982, the plaintiff wife commenced the instant action for divorce, predicated upon the defendant's alleged cruel and inhuman treatment of her during the course of the marriage. On January 24, 1983, the parties entered into a stipulation of settlement which was subsequently incorporated, but not merged, into the judgment of divorce and which provided, *inter alia,* that the defendant would pay the plaintiff the sum of $100 per week in rehabilitative maintenance for a period of 3½ years and that plaintiff would have exclusive possession of the marital residence until the emancipation of both of the children of the marriage. The stipulation further provided that the foregoing terms were to remain in force and effect "until the happening of any one of the following events: 1, the death of the plaintiff; 2, the remarriage of the plaintiff [and] 3, the plaintiff living together with another male unrelated by blood". Upon the occurrence of any of the aforesaid events, defendant's obligation to pay spousal support was to terminate and the marital residence was to be immediately sold.

In July of 1984, the defendant moved for an order directing the sale of the parties' former marital residence and suspending the defendant's obligation to pay maintenance, alleging that the plaintiff was now living with another man. The plaintiff cross-moved, *inter alia,* for leave to enter a judgment for arrears in maintenance. Following a hearing, Special Term found that the plaintiff was indeed living with another man, in violation of the parties' stipulation so as to cause the cessation of the defendant's obligation to pay spousal support

as well as necessitating the sale of the former marital abode. The plaintiff now appeals from this order.

Upon our review of the record, we find that the defendant failed to sustain his burden of proving that the plaintiff was living with another man so as to trigger the forfeiture provisions of the stipulation of settlement with respect to the defendant's maintenance obligations and the plaintiff's right to exclusive possession and occupancy of the marital residence (see, Smith v Smith, 88 AD2d 658; Spillman v Spillman, 67 AD2d 942, affd 49 NY2d 745).

While the present record discloses that the plaintiff had maintained a close personal relationship with a man unrelated to her by blood, we find that the evidence simply does not sustain the defendant's allegation that his former wife had violated the terms of the stipulation of settlement by cohabiting or living with this individual.

The term "living together" which, as our dissenting colleague aptly notes, defies precise definition, should encompass a possessory interest in the home. The plaintiff's friend, however, according to the testimony elicited at trial, maintains a separate legal residence in Nesconset, New York. He keeps virtually all of his personal belongings and receives all of his mail at that address. Moreover, his driver's license, registration and income tax returns all bear the Nesconset address as his residence. Although he admittedly slept at the subject premises on occasion, he testified that he frequently slept at the homes of his sister and his brother as well. Indeed, the record reveals that he has never spent a full week in the plaintiff's home, that he did not regularly shower there, and that he was required to bring with him a change of clothes and transport other personal accessories if he anticipated sleeping there overnight. He did not financially support the plaintiff and their relationship, which can best be described as transitory, was sporadically aborted by several "breakups", sometimes lasting for a period in excess of one month, and during which time there would be no contact between them.

Thus, the evidence adduced at the hearing clearly demonstrated that the plaintiff's friend possessed no legal rights to the premises in dispute. Rather, he was permitted to stay overnight at the plaintiff's whim, which she elected to exercise on a sporadic basis. Although it cannot be disputed that he rarely slept in his own living quarters, the fact nevertheless remains that he did maintain a separate legal residence and that he did not consistently sleep in the plaintiff's home but also slept, with as great a degree of frequency, in the homes of

his family members. The manner in which he chose to maintain his own living quarters and the conditions of this residence simply have no bearing on the issue raised herein.

We similarly find that the quality of the relationship between the plaintiff and her friend and the fact that they "cared for the needs of one another" is not dispositive of the issue of whether they had lived together in violation of the parties' separation agreement. That the plaintiff's friend provided emotional support and companionship to the plaintiff and the fact that they had been intimate does not, in and of itself, compel the conclusion that they had been cohabiting on a permanent basis, thereby necessitating that the plaintiff and her daughters lose their home. Rather, the credible evidence adduced at trial reveals that the plaintiff's friend's sleeping arrangements were usually spontaneously made, that he often watched the plaintiff's children while she was at school and slept on the couch in the event she returned home at a late hour, and that if he provided some financial assistance to the plaintiff, it was only because she was in dire financial straits by virtue of the fact that the defendant wrongfully engaged in self-help tactics and unilaterally decided to withhold support payments.

In short, we conclude that the defendant has failed to prove by a preponderance of the evidence that the plaintiff had forfeited her rights under the stipulation by living with another man. The plaintiff and her friend maintained separate residences, frequently slept in those separate residences, did not share household expenses and did not otherwise function as an "economic unit" (see, Scharnweber v Scharnweber, 105 AD2d 1080, affd 65 NY2d 1016; Brown v Brown, 122 AD2d 762, appeal dismissed 68 NY2d 910). Accordingly, Special Term's conclusion that this relationship was tantamount to and could properly be characterized as "living together" was unwarranted.

We further find, and the record, in fact, reflects that the defendant failed to satisfy his obligation to pay spousal support for the 27 weeks preceding the hearing conducted by Special Term. The defendant's failure to do so was without justification and plaintiff's cross motion, inter alia, for leave to enter a judgment for the amount of arrears due and owing should, therefore, have been granted. For similar reasons, we find that the plaintiff was improperly denied an income deduction order (see, CPLR 5242 [b]).

Finally, after considering the circumstances of this case as

well as the needs and financial abilities of the parties, we conclude that an award of counsel fees in favor of the plaintiff would be appropriate. Accordingly, the matter is hereby remitted to the Supreme Court, Suffolk County, for further proceedings consistent herewith. Eiber, J. P., Kunzeman and Kooper, JJ., concur.

Spatt, J., dissents and votes to affirm the order appealed from, with the following memorandum: The issue squarely presented is whether the defendant has proven by a fair preponderance of the evidence that the plaintiff, his former wife, was "living together with another male unrelated by blood" which would terminate his maintenance obligations and permit sale of the marital home pursuant to the express terms of a stipulation of settlement. In my view, the proof adduced at trial reveals that the plaintiff violated the stipulation by living with such a male.

The parties were married in 1967 and have two daughters who were 14 and 10 years of age, respectively, at the time of the hearing. Late in 1982, the plaintiff commenced an action for divorce, and, on January 24, 1983, in open court, the parties entered into a stipulation of settlement which provided for joint custody of the children who would reside with the plaintiff. Exclusive occupancy of the marital residence was given to the plaintiff. The defendant agreed to pay child support which could be increased in the event maintenance was terminated. The stipulation further provided that maintenance would cease and the marital residence would be sold upon the happening of certain events, including, "the plaintiff living together with another male unrelated by blood". With respect to this provision, the following colloquy occurred:

"THE COURT: Is that under the circumstances contained in the statute? [Presumably Domestic Relations Law § 248]

"[Plaintiff's Attorney]: No, Your Honor, it is not."

Sometime in the fall of 1981, the plaintiff met the man in question at a "Parents Without Partners" dance. The plaintiff herself testified that for a two-year period prior to the October 1984 hearing, her male friend would stay overnight at the former marital residence one or two weeknights. In addition, she stated that he stayed with her over the weekends for about a year prior to the hearing. The plaintiff's male friend testified that he stayed overnight at the former marital home as often as 4 or 5 nights each week, as follows:

"Q And is it fairly accurate to say that you slept over [at] her house at least four times a week or five times a week?

That's pretty accurate, including the weekend? I don't want to differentiate the weekend from the week. Seven days in a week, and you say it's fairly accurate that you stay over there between four and five days?

"A All right, close to it.

"Q Four or five days you stay over [at] her house? You sleep over there most of the time, do you not?

"A: If it was *[sic]* late, yes, I do. Yes."

The plaintiff and her friend slept together in the same bedroom on weekends and on other occasions when the parties' children were not at home. The plaintiff's friend testified that on the nights he did not sleep at the former marital residence, he slept at the homes of either his sister or brother. His sister testified that she lived in a two-bedroom apartment which she shared with her 19-year-old son until he moved out approximately four months before the hearing. The plaintiff's friend allegedly slept on a sofa in her apartment. Only fleeting reference is made to the plaintiff's friend's brother who allegedly rented a house. There were apparently a number of occasions during the two years prior to the hearing when the plaintiff and her friend had "break ups" during which they did not see each other for as much as a month.

Although the plaintiff's friend maintained separate living quarters, it is questionable whether he ever slept there. This purported residence was a 12-foot by 12-foot single room in a boarding house. The room contained a bed, two dressers and a refrigerator. It did not contain a stove, hot plate or apparently any other cooking·facility. He had a telephone in this room equipped with a recall answering machine, which permitted him to obtain his messages without having to actually visit the room. He had his own roofing and siding business, and he used this room as his business address. In his testimony, he referred to this room as his "office". There was no evidence elicited that this room was used as his residence.

The plaintiff's friend used a van in his business to carry tools and materials to his various jobsites. Title to the van was transferred to the plaintiff who drove it occasionally. A neighbor of the plaintiff testified that he saw the van parked in front of the former marital residence approximately 90% of the time for the six-month period prior to the hearing. The plaintiff assisted her friend by acting as the bookkeeper for the business. Also, he stored his tools in the garage at the marital home.

The plaintiff and her friend cared for each other's needs in

a number of ways. The plaintiff was a college student, and during the semester preceding the hearing, she had two early morning classes a week. He would stay over the night before these classes so he could send the children to school the next day. On the days she had evening classes, her friend would baby-sit and stay overnight. When he stayed over, he would bring food that the plaintiff would prepare for them and the children. He did work around the house, repaired a leak in the roof and installed aluminum siding on the front of the home, all at his own expense. He also ran errands for the plaintiff and used her car. The testimony at the hearing also revealed that the plaintiff cared for her friend's needs. She would occasionally wash his clothes when he stayed over and care for him when he was sick. There was conflicting testimony as to how much clothing he would leave at the plaintiff's home, but it is apparent he kept at least one change of clothing regularly at her home.

It is noted that, as of the time of the hearing in October 1984 this relationship was apparently continuing, notwithstanding the possible adverse pecuniary consequences to the plaintiff of which both she and her friend were admittedly aware.

The Court of Appeals recently reiterated that "living together" agreements, such as the one before us, are enforceable, as follows: "parties may, in a separation agreement, condition a husband's obligation to support his wife solely on her refraining from living with another man without the necessity for the husband to also prove that she habitually holds herself out as the other man's wife•as Domestic Relations Law § 248 requires *(see, Northrup v Northrup,* 43 NY2d 566). If the wife has voluntarily entered into the agreement then the court may not refuse to enforce it absent some overriding public policy reason * * * or alter its provisions without the consent of the parties" *(Scharnweber v Scharnweber,* 65 NY2d 1016, 1017).

It bears emphasis that, as in *Scharnweber,* this case is not governed by Domestic Relations Law § 248 which would require that the wife habitually live with another man *and* hold herself out as being married to him. The separation agreement was incorporated but not merged into the judgment of divorce, and it is a separate contract which must be construed like any other agreement entered into between adults represented by counsel *(see, Kleila v Kleila,* 50 NY2d 277). In construing this agreement, our sole concern is whether Special Term erred in determining that the plaintiff had breached the

"living together" provision. The defendant need only prove such breach by a fair preponderance of the credible evidence (*Brown v Brown,* 122 AD2d 762).

"Living together", though a common expression in the lexicon of both the lawyer and layperson, resists precise definition. Various courts and scholars have grappled with this elusive phrase with mixed results. Although no exact definition emerges from these treatments, certain recurring factors become apparent, and a rough composite emerges from a review of New York case law and that of other jurisdictions.

One of the most significant decisions construing "living together" albeit under Domestic Relations Law § 248 is *Northrup v Northrup* (43 NY2d 566, *supra*). Although the Court of Appeals reversed the hearing court by finding there was no "holding out" under the statute, it did not disturb the hearing court's determination that the plaintiff wife "lived with" another man. The factors the hearing court relied upon in making this determination were that for a period exceeding six months, the plaintiff wife shared the same bedroom with this man, cooked his meals, did his wash, permitted him to use her car and shared household expenses with him.

This court recently addressed the issue of living together in *Brown v Brown* (122 AD2d 762, 763, *supra*). In holding that such an arrangement did not exist, the majority noted that "[t]here was no evidence that the defendant and [the unrelated male] ever slept together or had engaged in sexual relations, nor was there evidence that they socialized together, except on those occasions when they visited the defendant's brother. They did not take their meals together and did not cook for or purchase food for each other".

In *Scharnweber v Scharnweber* (105 AD2d 1080, *affd* 65 NY2d 1016, *supra*), the Fourth Department held that the record did not support a finding of "living together", because the individual did not share household expenses or a bedroom and did not function as an economic unit. In *Cohn v Cohn* (NYLJ, Apr. 13, 1981, at 15, col 5), the trial court denied a motion by the plaintiff wife to set aside a jury verdict that found her to be "living with an unrelated adult male for a period of three continuous months" in violation of the terms of a separation agreement. In denying the motion, the court noted that the plaintiff and the male friend had sexual relations on a regular basis for a period of approximately 11 months, vacationed together and frequently dined and socialized together. Also significant to the court was that in the

early part of their relationship, the plaintiff and her male friend both moved into separate apartments in the same apartment complex, apparently with the male friend's apartment seldom being used.

Courts in other jurisdictions have focused on similar factors in attempting to define the term "living together" and/or "cohabitation".* *Richardson v Hunte* (435 So 2d 1315 [Ala]) defined cohabitation as a permanent relationship with more than occasional activity manifested by the sharing of a dwelling. In *Quisenberry v Quisenberry* (449 A2d 274 [Del]), the court held that the factors demonstrating cohabitation include living together with some degree of continuity, engaging in sexual relations and sharing financial benefits. Other courts have focused exclusively on economic issues *(see, Kaplan v Kaplan,* 186 Conn 387, 441 A2d 629; *Matter of Marriage of Vasconcellos,* 58 Ore App 390, 648 P2d 1358).

All of the factors discussed above, as well as others peculiar to the particular case, should be considered by the court in determining whether a former spouse is "living together" with another person, with no single factor dispositive in and of itself. One commentator distilled and synthesized these numerous factors into one simple test question: "Do the couple generally care for each other's needs?" (Florescue, Domestic Relations Law—Recent Developments, NYLJ, June 18, 1984, at 3, col 1).

In my view, based on the criteria set forth in *Northrup* and *Brown,* among other cases, the plaintiff and her friend were living together. Not only did they maintain a close personal relationship but they were engaged in this relationship in the former marital home on a regular basis for two years, and the relationship was still continuing at the time of the hearing.

Undoubtedly, a major reason for including such a living-together clause, in addition to preventing the unfair support of a former spouse who is obtaining financial assistance from a person he or she is living with, is "to shield children of tender years from a type of lifestyle perceived by the non-custodial parent as potentially harmful" *(Pollack v Pollack,* NYLJ, Mar. 19, 1982, at 13, cols 4, 5). Here, a 14-year-old and a 10-year-old daughter were living with the plaintiff at the

---

* The Appellate Division, Third Department, has used these terms interchangeably *(see, Matter of Collyer v Proper,* 109 AD2d 1010, 1011, *affd* 66 NY2d 382, discussing *Northrup v Northrup,* 43 NY2d 566). However, at least one court has held that "living with" and "cohabitation" are not synonymous, in that "living with" is a "broader" term *(Kaplan v Kaplan,* 186 Conn 387, 441 A2d 629).

former marital residence at the time of the hearing. Under the circumstances, we cannot say that the parties intended to consider only economic factors by use of the phrase "living together". More likely, the parties intended to include all the elements of such a relationship that the phrase connotes to the average person.

Moreover, there is evidence in this record that the plaintiff and her friend did, at least partially, share household expenses and were economically involved. The plaintiff's friend received "room and board" from the plaintiff, financed by the defendant, 4 or 5 nights per week for a period of approximately two years. In addition, he transferred a van to the plaintiff, he paid for tires on her car, he did roofing and siding work on the house for her without charge, and she performed bookkeeping services for him. Thus, not only did they have an intimate, long-standing personal relationship but they shared economic benefits as well.

To hold that plaintiff's close personal and economic relationship with her friend for approximately 4 or 5 days a week over a two-year period to the time of the hearing is insufficient to violate the terms of this "living together" agreement is to render it virtually meaningless and impermissibly alter its provisions without consent of the parties *(see, Brown v Brown, supra; Scharnweber v Scharnweber, supra)*. Special Term's decision, after a hearing, that the conduct of plaintiff and her friend "clearly and convincingly evinces a living together between the parties" is fully supported in the record and is in accord with the precedents.

Finally, Special Term did not err in excluding the testimony of Carol Peritore as to the nature of the relationship between the members of "Parents Without Partners".

The order should be affirmed in all respects.