OPINION OF THE COURT
Martha K. Zelman, J.
This is a motion to punish the defendant for contempt of court brought on by an order to show cause.
The plaintiff movant is seeking the following relief:
(a) Pursuant to Domestic Relations Law § 244, a money *666 judgment in the sum of $18,000 (as of Apr. 17, 1987) with interest;
(b) Pursuant to Judiciary Law §§ 750 and 753 to have the defendant held in contempt of court for his willful and contumacious refusal to comply with the judgment of divorce dated May 6, 1979;
(c) Pursuant to Domestic Relations Law § 238, an award of reasonable counsel fees arising out of defendant’s default.
The parties herein were married on March 15, 1975 in Nassau County, New York. There are no children of the marriage. On April 6, 1979 the parties entered into a separation agreement and a judgment of divorce was granted May 6, 1979, under which the terms and conditions of the separation agreement survived and did not merge into the judgment. The gravamen of this matter is based on an interpretation of the language of article III, paragraph 1, of the separation agreement which provided that the defendant pay plaintiff the sum of $350 per week for maintenance. The aforesaid paragraph reads:
"All liability of the husband for the support and maintenance of the wife as provided in this Article and as provided in Article IV shall cease upon the happening of whichever of the following shall first occur:
"(i) the death of the husband;
"(ii) the death of the wife;
"(iii) the remarriage of the wife; or
"(iv) in the event the wife is habitually living together with an adult male for a period of more than 60 days, irrespective of whether they held themselves out as husband and wife while so habitually living together”.
The plaintiff, Carole Lefkon, testified that since 1981 defendant husband began to fall behind in alimony payments. In April and May 1986 she brought the eighth small claims action against the defendant husband. Many conferences were had between the attorneys, but the matter couldn’t be resolved. Defendant alleges as a defense to the action that plaintiff is "habitually living with another man for a period of more than 60 days”. Defendant testified that he had been paying this support from 1981 until May 1986 when he learned about the other man. Plaintiff testified that she met a Mr. Martin in 1983 while she was working at a bank and that they struck up a business relationship. On or about February or March 1984, she began dating Mr. Martin and two months *667 later proceeded to sexual intimacy which occurred in her apartment once or twice a week. Plaintiff testified that she kept a record on two calendars, a 1986 Nationwide Savings calendar and a Girl Scout calendar starting March 30, 1986 of her sexual activities by circling with a red circle the dates on which Mr. Martin came to her home and had sexual relations with her and slept over. The red circles added up to approximately 58 nights and, strangely enough, the record ended on April 11, 1987 although her testimony was that she and this particular man were involved in this relationship until the date of trial. She also kept a Girl Scout Pocket Planner.
Plaintiff, Carole Lefkon, testified that she saw no other man except Mr. Martin and that she loved him but was not "in love” with him. She stated that Mr. Martin was general sales manager of a Chevrolet distributorship and had throughout the relationship provided her with the free use of three cars over a period of a year. Plaintiff testified that she had spent two or three vacations with this man but they were registered under their own names. Mr. Martin paid for all the expenses of the trips, dinners and entertainment.
Mr. Joseph Martin took the stand and testified that he sublet an apartment in Jackson Heights from a friend, and would return to this apartment on weekends when plaintiff’s daughter would come to visit her mother. All other nights apparently were spent with Mrs. Carole Lefkon, the plaintiff. He testified he knew about this clause in her divorce agreement and agreed to cooperate with plaintiff in adhering to its terms. The testimony showed that he had no name on his or her letterbox. He testified that he left his laundry when he left her apartment and she would do same. He showed 10 envelopes addressed to the Jackson Heights apartment, some without a postmark, others postmarked no earlier than December 8, 1986. Mr. Martin testified that he knew about this clause in the separation agreement and that he had driven Carole Lefkon to Small Claims Court many times to sue the doctor for payments. Mr. Martin could produce no serious mail to the apartment with the alleged friend, i.e., a driver’s license, an income tax return.
The next witness to take the stand was a Matthew Gardner, who worked at the dealership with Mr. Martin during the summer of 1984. He had many conversations with Mr. Martin and the other salesman from the summer of 1984 until March 1985, when Mr. Martin left that job. He said they all would have "man talk” during coffee breaks wherein the men would *668 brag about their sex lives. During such a coffee time, Mr. Martin allegedly related that he had the best of two worlds— he was living with the plaintiff, Carole Lefkon, and her husband, the doctor, would be paying $1,500 a month for it. All he had to do was maintain an extra apartment. During a conversation, Mr. Martin mentioned the defendant doctor’s last name. At this time, Mr. Gardner realized this was the doctor that he and his wife used. The next time Mr. Gardner saw Dr. Drubin, he told him he knew someone that was living with "his Ex”. This led to the doctor stopping payments and hiring a detective.
The next witness called by the defense was a Professor Leonard Ashley, an expert on the American English language with a long and distinguished resumé on the interpretation of the English language and its meaning. He contributed a long history of the English meaning of the word "habitually” and the phrase "living together”. He defined "habitually” as meaning "habit”. He stated "living together” could mean anything from being a polite way of saying having sexual intercourse to shacking up, to sharing a room.
Dr. Drubin, the defendant, testified that he was management consultant to chiropractors. He stated that he met the plaintiff, Carole Lefkon, in February 1973 in Mexico, while they both were married to other people. He said he divorced his first wife and that a separation agreement resulting from that marriage had the same clause in it as a condition for terminating alimony as is involved in this case. He said the plaintiff, Carole Lefkon, didn’t like his first wife receiving $300 a week and she helped him get the first wife by following her, taking pictures of men the first wife dated. Defendant stated the plaintiff was no "innocent” to this clause and its significance. She had worked right along to catching "Nerry”, the first wife, with detectives, having a relationship with a man. However, now that the plaintiff was in the same shoes as "Nerry”,. his first wife, she didn’t like it. The doctor testified he was now married to the present Mrs. Drubin since December 1980 and they had two small children. He never intended to maintain his second wife, the plaintiff, while she violated the clause.
Several other witnesses were called with no significant testimony.
The separation agreement was a contract and the matter rests on the interpretation of "habitually” and "living to *669 gether” and the "intent” of the parties at the time they entered in the contract.
The attorney for the plaintiff, Carole Lefkon, argues that the legal consequences of the facts as applied to the existing law becomes the burden and responsibility of the court. Plaintiff’s attorney argues this is not an adultery case. The attorney states these people, his plaintiff client Carole Lefkon and Mr. Joseph Martin, are sleeping together. They are entitled to do that — they are single people but they do not live together. He states as the plaintiff, Carole Lefkon, testified, sleeping together is not a basis to determine they are living together, there is no economic sharing. There is a separate residence and everybody goes on with their lives. Plaintiff’s attorney asks for a judgment of $18,000 arrears as of the trial of this action.
The attorney for Dr. Drubin argues his client entered into an agreement which he wished to honor and for five or six years he has honored the contract religiously paying plaintiff Carole Lefkon $300 per week until he learned that she was "habitually” living with a man unrelated by blood for a period of 60 days. It is to be noted the clause avoids words "continuous” or "consecutive”. The defendant testified his intention was to pay until plaintiff’s conduct triggered the clause.
Both attorneys concede that in discharge of that responsibility we have the benefit of the recent case, Salas v Salas, a 3 to 1 decision (128 AD2d 849).
In Salas (supra), the parties were married in 1967 and divorced in 1982, a 15-year marriage. The parties had two infant issue of the marriage and the wife had been receiving rehabilitative maintenance for a period of 3 Vi years at $100 a week. In Salas, the agreement provided that the husband would have exclusive possession of the home based on (1) death of wife; (2) remarriage of the wife; or (3) wife living together with another male unrelated by blood. In Salas, the man the wife was allegedly living with kept his own apartment in Nesconset, New York, where he kept his belongings and received all his mail such as tax returns and registration. He also frequently slept at his sister’s home or brother’s home. In 1982 the plaintiff wife commenced a divorce action for cruel and inhuman treatment, and exclusive use of the marital residence until the emancipation of both children of the marriage. In July of 1984, the defendant moved for sale of the house claiming the plaintiff was living with another man. *670 In Salas, the wife was allegedly living together with a man but their relationship was sporadically aborted by several "break-ups”, sometimes for more than a month. The court found that the wife and this man were not living together as an economic unit — they didn’t share household expenses. The court held that the husband failed to sustain his burden of proving the wife was living with another man so as to trigger the forfeiture provisions of the stipulation of settlement.
Both attorneys argue that the Salas (supra) case, although it has a similar clause, is not in line with the case at bar. Unlike our case, the agreement in Salas does not contain the word "habitual” nor does it contain the words "for a period of more than 60 days”. In the Salas case the wife had exclusive possession of the house, the marriage was of long-time duration, and two infant children were involved. The stipulation, if triggered, would have thrown her out of the house. The vigorous dissenting opinion written by Justice Spatt states we don’t really know "what living together means.” Justice Spatt, in holding that they are "living together”, cites Leonard Florescue, a well-known authority who writes for the New York Law Journal regularly on matrimonial law, and says it’s not factors of economics alone, but many factors that determine what "living together” means. The plaintiffs witness, Professor Ashley, testified and tried to tell us what the phrase "living together” means in plain ordinary language. Plaintiffs attorney makes a big issue of economically "living together” but defendant’s attorney argues "living together” could mean that his son in college is living together with a roommate in which the parents are paying. Does this not mean living together? The people involved are not paying, the parents are. Many people live together but they do not dip in to share expenses. The key to living together then is really not sharing expenses. The attorney for the defendant points out that if one looks at a common-law relationship, the woman is cleaning, cooking, rearing the children, while the man is working. We can’t reason they’re not living together because there is no financial contribution to the rent by the woman.
In the case at bar the contract was incorporated in the judgment of divorce and survived but did not merge into the judgment of divorce, and it is a separate contract which must be construed like any other agreement entered into between adults represented by counsel. (See, Kleila v Kleila, 50 NY2d 277.) If the parties voluntarily entered into the agreement, the court may not refuse to enforce it absent some overriding *671 public policy reason or alter its provisions without the consent of the parties. (See, Scharnweber v Scharnweber, 65 NY2d 1016.)
Here we have a clear pattern. The plaintiff took the stand and told us she took out two calendars and circled in red the days Mr. Martin slept with her and then went home. She testified Mr. Martin knew that the plaintiff couldn’t habitually live with another man for more than 60 days. The plaintiff obviously marked off the calendar as soon as she learned the defendant wasn’t going to pay any more. It is the opinion of this court that plaintiff and Mr. Martin knew if they didn’t watch themselves and stayed together all the time she would lose her support. Otherwise, why would she keep such a record. The other pages of the calendars are blank. The plaintiff testified she knew about the first wife, and, in fact, helped Dr. Drubin find his former wife with another man.
Plaintiff and Mr. Martin went away together according to the testimony on two vacations and Mr. Martin paid for them. The case at bar is distinguishable from the Salas (supra) case in that they habitually lived together, it wasn’t a transitory relationship, it was always the same man. The evidence showed he had personal belongings in her apartment. He had another apartment with a friend but he didn’t demonstrate that he ever lived there. The plaintiff testified she did his laundry in the apartment. Mr. Martin testified that he permitted the use of a car to plaintiff for one year.
It is this court’s conclusion that the plaintiff and Mr. Martin were "habitually living together” for a period in excess of 60 days.
Accordingly, the relief requested by the plaintiff is denied in all respects.