■ LINDA R. GRAEV, Respondent, v LAWRENCE GRAEV, Appellant. LAWRENCE GRAEV, Appellant, v LINDA R. GRAEV, Respondent. [848 NYS2d 627]—

Judgments, Supreme Court, New York County (Saralee Evans, J.), entered July 3 and July 31, 2006, awarding plaintiff wife maintenance arrears and attorneys' fees, and bringing up for review prior orders, including that entered March 14, 2006, which, after a hearing, granted plaintiff's motion to enforce the

---

parties' settlement agreement and denied defendant's cross motion for summary judgment terminating his maintenance obligation under that agreement, and directed defendant to resume such payments and pay arrears, affirmed, without costs. Appeals from the orders dismissed, without costs, as subsumed in the appeals from the judgments.

The issue on appeal is whether plaintiff Linda Graev forfeited her right to maintenance because of what defendant Lawrence Graev alleges was "cohabitation" with a nonparty ("MP") for "sixty (60) substantially consecutive days" in the summer of 2004. Based on the evidence in the record, plaintiff's relationship with MP did not constitute "cohabitation" as this term has been construed. Accordingly, we affirm the judgments appealed.

Linda and Lawrence Graev were married for approximately 24 years. In April of 1997, they executed a settlement agreement, which was incorporated but not merged into their divorce judgment in June 1997. Article IV of the settlement agreement concerned maintenance and provided that Mr. Graev would pay his ex-wife $10,000 per month. This was later adjusted to $11,000 per month pursuant to a cost-of-living provision. The agreement provided that the maintenance obligation would terminate on August 10, 2009, or upon the occurrence of any one of four "Termination Events." Those events, set forth in section 4.2, were:

"(a) the death of the Wife;

"(b) the death of the Husband;

"(c) The remarriage of the Wife regardless if such remarriage is void or voidable; [or]

"(d) the cohabitation of the Wife with an unrelated adult for a period of sixty (60) substantially consecutive days."

The term "cohabitation" is not defined in the agreement.

On September 7, 2004, Mr. Graev sent Mrs. Graev a letter stating that he would no longer pay her maintenance because of her "cohabitation" with MP for 60 substantially consecutive days. Mrs. Graev moved to enforce the divorce judgment and for an order directing defendant to resume paying maintenance plus arrears, as well as legal expenses pursuant to section 21.1 of the settlement agreement. Mr. Graev cross-moved for summary judgment allowing him to cease paying maintenance. He further requested $500,000 in liquidated damages pursuant to section 14.2 of the settlement agreement,* expenses, costs and attorneys' fees.

---

* Section 14.2, an in terrorem provision, provides for a $500,000 penalty to be imposed upon any party who attempts to vacate or breach the contract.

Mr. Graev's motion was supported with the affidavit of a private investigator. He stated that he and his team had been hired by Mr. Graev to conduct surveillance of Mrs. Graev's Connecticut house for nine hours a day over a 63 day period during July and August of 2004. The team confirmed that Mrs. Graev lived on Keeler Road in Bridgewater and that MP had a home nearby, on Brown Brook Road in Southbury. The investigator also affirmed that MP's car was in Mrs. Graev's driveway at 5:00 A.M. on virtually all of the 63 days that they conducted surveillance. The investigator related that there was a nine-day period when the "newspapers piled up" at Ms. Graev's residence. During that same nine-day period, "there were no signs of activity" at MP's residence.

In reply, Mrs. Graev denied that she "cohabitated" or lived with MP. She stated that her primary residence was and is in New York City, where she works full time from September to June of every year. She stated she has a summer house in Connecticut, and that MP owns his own home near hers. Mrs. Graev affirmed that MP stayed with her for approximately two weeks between the sale of one home in Connecticut and his purchase of a new home.

In February 2005, the IAS court determined that Mr. Graev was entitled to a hearing to determine whether there had been a "terminating event." Prior to the hearing, the husband moved for leave to introduce evidence, including expert testimony, as to the meaning of the term "cohabitation." It was his position that the term was ambiguous. Thus, he sought to offer testimony as to "how usage or custom has affected and influenced the meaning of the term." He also wanted to present evidence showing the circumstances surrounding the dissolution of the marriage because, he asserted, they were instructive as to the parties' intent when they included the term in their agreement. The IAS court denied the motion. It found that a prior ruling in this action, that the term "cohabitation" was not ambiguous, was law of the case. While it does not affect our analysis, it bears noting that the prior IAS court ruling did not explicitly state that the term "cohabitation" was unambiguous, but instead that the term had not been construed in the narrow manner that Mrs. Graev suggested.

A hearing was conducted over seven days between September 14 and December 1, 2005. Testimony was taken from Mr. Graev, Mrs. Graev, MP, MP's son, and Mrs. Graev's doctor. Mr. Graev testified that he first met MP in June 2003, when he and Mrs. Graev attended their daughter's engagement party. He stated that MP also accompanied Mrs. Graev to two other family par-

ties in 2004. Mr. Graev also described how he had hired a private investigator to monitor Mrs. Graev's house in Connecticut over the summer of 2004.

The head of the private investigation team was not called to testify at the hearing because he was out of state, but the parties agreed to introduce his surveillance tapes and deposition testimony. The surveillance evidence included photos and videos of the driveway area of plaintiff's summer house from 5:00 to 9:00 A.M., and 7:00 P.M. to midnight for 63 days. No surveillance was conducted from midmorning until the evening on any of the days in question. However, the evidence shows that MP's car was in Mrs. Graev's driveway "virtually all" of the mornings and nights that the investigators were watching her house.

Mrs. Graev took the stand and gave her address as a location on Fifth Avenue in Manhattan. She stated that she worked full time as a reading specialist at a private school in the City. Mrs. Graev informed the court that her New York address was where she received all of her mail, including all bills for both of her homes. Mrs. Graev stated that her work begins after Labor Day and ends in the middle of June. She testified that she stays in Manhattan during the week throughout the school year, and that she goes to her house in Connecticut most weekends and during summer vacation. Mrs. Graev said she pays taxes in New York. She added that she votes in New York.

Mrs. Graev recounted that she met MP in Connecticut in October 2002, years after her divorce. She said that they began dating shortly thereafter, and that their relationship became romantic in January 2003. She testified that they are exclusive companions. However, Mrs. Graev stated that she and MP have never discussed living together, and they do not presently commingle their finances, nor have they made any plans to do so. She testified that the two spent many nights together in Connecticut, where they both own separate homes. Mrs. Graev also recounted that she made frequent trips into New York during summers to attend to chores, and that when she did so, she went alone.

Mrs. Graev testified that throughout her relationship with MP, they split the costs of all shared items, such as meals, movies, and travel. She said that MP helped her with planting in her garden on a few occasions, and that he once helped her to paint a fence. However, she said that the two took care of their own separate household chores. Mrs. Graev testified that she employs both a housekeeper and a gardener at her Connecticut house. Mrs. Graev averred that MP makes no financial contribution to the upkeep of her home, nor she for the maintenance of his home.

Mrs. Graev explained that the couple's overnight visits were more frequent in the summers because she was on vacation and spending the majority of her time in Connecticut. She related that the first summer the two were dating, 2003, MP spent "a couple of nights during the week" and "one night on the weekend" at Mrs. Graev's house. It was her recollection that during the summer of 2004, she and MP spent more nights together. However, Mrs. Graev also testified that she was planning her daughter's wedding during that summer, which required her to travel to New York City frequently.

MP testified that he is a retired school administrator and lives in Connecticut. His description of his relationship with Mrs. Graev was substantially similar to Mrs. Graev's. He also stated that from August 16 to August 28, 2004, between the sale of one home in the area and the purchase of another, he stayed with Mrs. Graev. During that period, he also stored some of his property in plaintiff's garage. MP testified that he did not have a key to Mrs. Graev's home, but that she had told him the location of a spare key. He said he used this key while he stayed with Mrs. Graev between his house closings.

MP's 25-year-old son testified that he had lived with his father for part of the summer of 2004. The son recalled frequently having dinner with his dad, and occasionally with Mrs. Graev. He also stated that his father spent a substantial part of his days painting, a hobby which he enjoyed. He testified that his father did his painting at his own house. MP's son stated that he did not know much about this litigation, other than the fact that it concerned "cohabitation."

The final witness at the hearing was Mrs. Graev's psychiatrist. He was qualified as an expert in psycho-pharmacology and had been treating Mrs. Graev for depression since 1998. He stated that he had prescribed medication for her, which had adverse sexual side effects.

After hearing the testimony and examining the evidence, the IAS court concluded that there had been no "cohabitation" and that Mrs. Graev had not forfeited her right to maintenance. Mr. Graev appeals. He contends that the term "cohabitation" is ambiguous, and that there are no New York cases which define the term. He argues that he should have been allowed to introduce extrinsic evidence as to the parties' intent when they included this term in their settlement agreement. He also contends that expert testimony should have been admitted to aid the trial court in understanding the term "cohabitation," as understood in "modern society."

Mrs. Graev counters that New York courts have uniformly

construed "cohabitation" as synonymous with "living together." She argues that this includes three elements: (1) sharing a residence, (2) sharing expenses, and (3) functioning as an economic unit. Because none of these elements was present here, she urges that we affirm the judgments appealed.

Domestic Relations Law § 248 allows the court to eliminate maintenance upon "proof that the wife is habitually living with another man and holding herself out as his wife." This statutory two-part test has been rigidly applied, requiring that each prong be proven (*Northrup v Northrup*, 43 NY2d 566 [1978]; *see also Markhoff v Markhoff*, 225 AD2d 1000 [1996], *lv denied* 88 NY2d 807 [1996] [maintenance terminated where both statutory elements were met]).

For example, the Court of Appeals has rejected a husband's application to terminate his maintenance obligation to a former spouse because the second of the two requirements of Domestic Relations Law § 248 had not been met. In *Matter of Bliss v Bliss* (66 NY2d 382 [1985]), the former wife had been living with another man for 12 years, but there was no evidence that she was representing herself as married to her companion (*see also Szemansco v Szemansco*, 11 AD3d 787 [2004]; *Matter of Messineo v Messineo*, 196 AD2d 826 [1993]; *cf. Karl v Karl*, 138 AD2d 354, 355-357 [1988, Weinstein, J., concurring], *lv denied* 72 NY2d 803 [1988]).

Notwithstanding these strict statutory requirements, the parties to a divorce can, by agreement, alter the terms of Domestic Relations Law § 248. They can, if they choose, eliminate the statutory requirement that the wife "holds herself out as the other man's wife" (*see Scharnweber v Scharnweber*, 65 NY2d 1016, 1017 [1985]; *see also Smith v Smith*, 233 AD2d 830 [1996]; *Pesa v Pesa*, 230 AD2d 837 [1996]).

Agreements modifying Domestic Relations Law § 248 are uniformly viewed as contracts subject to the principles of contract construction and interpretation (*Matter of Meccico v Meccico*, 76 NY2d 822, 823-824 [1990]; *Rainbow v Swisher*, 72 NY2d 106, 109 [1988]). As with any contract the "best evidence of what parties to a written agreement intend is what they say in their writing" (*Slamow v Del Col*, 79 NY2d 1016, 1018 [1992]). Accordingly, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]).

Whether a contractual term is ambiguous must be determined by looking within the four corners of the document and not to extrinsic sources (*Kass v Kass*, 91 NY2d 554, 566 [1998]; *Matter*

*of Stravinsky*, 4 AD3d 75, 81 [2003]); extrinsic evidence cannot be used to create an ambiguity in an agreement, but only to resolve an ambiguity (*Kass*, 91 NY2d at 568). That one party to the agreement may attach a particular, subjective meaning to a term that differs from the term's plain meaning does not render the term ambiguous (*see Moore v Kopel*, 237 AD2d 124, 125 [1997]).

Here, the settlement agreement provided that Mrs. Graev would forfeit her right to maintenance if she "cohabit[ed] . . . with an unrelated adult for a period of sixty (60) substantially consecutive days." A review of New York case law shows that in the context of these types of separation agreements, the term cohabitation has a plain meaning which contemplates changed economic circumstances, and is not ambiguous. Just as it is sensible to presume that when the Legislature amends a statute it is aware of all judicial decisions construing it (*see People v Robinson*, 95 NY2d 179, 184 [2000]), it is also sensible to presume that attorneys using a term such as "cohabitation" in a separation agreement are aware of the judicial decisions construing the term.

The dissent presumes that these parties intended to use the dictionary definition of "cohabitation." However, it fails to explain why judicial decisions giving a distinct meaning to the term should be ignored. For example, the Second Department recently discussed the meaning of "cohabitation" when affirming the denial of a husband's motion to terminate his maintenance obligation. Rejecting a claim that the phrase "cohabitation of the Wife with an unrelated male" was ambiguous, the court stated: "As interpreted by New York courts, the term 'cohabitation' entails a relationship between a former wife and an unrelated male who live together in the same residence and share household expenses or 'function as an economic unit' (*see Matter of Ciardullo v Ciardullo*, 27 AD3d 735, 736 [2006]; *Matter of Emrich v Emrich*, 173 AD2d 818, 819 [1991]; *Scharnweber v Scharnweber*, 105 AD2d 1080, 1080 [1984], *affd* 65 NY2d 1016, 1017 [1985])." (*Clark v Clark*, 33 AD3d 836, 837, 838 [2006].)

While the facts in this case are different from *Clark*, where the wife and the parties' children had moved into a "commune" with another family soon after the divorce was finalized, the Clarks' settlement agreement was similar to the Graevs' in that it provided for termination of maintenance if the wife "cohabitat[ed] . . . with an unrelated male" (*id.* at 837). Here, as in *Clark*, Mr. Graev had the burden of establishing an event that terminated his maintenance obligation. He did not meet this burden.

The Second Department's decision in *Ciardullo* is also instructive. The event which would terminate maintenance in the Ciardullos' agreement was "habitually living" or "establishing a residence with a man." (27 AD3d at 736.) Adopting the same analysis articulated in *Clark*, the court held that the wife and her boyfriend were not "habitually living" together because they maintained separate residences and neither shared expenses nor functioned as an economic unit (27 AD3d at 736).

New York courts have uniformly construed the term "cohabitation," when used in agreements governing the modification of support obligations, as more than a romantic relationship or series of nights spent together. It is the dissent's position that the economics of Mrs. Graev's relationship with MP are irrelevant. However, New York case law interpreting similar clauses looks to the sharing of finances to determine whether parties are "cohabitating." This analysis makes sense, given the underlying question of whether the relationship at issue is the type of "changed circumstances" which would render a support obligation unjust. While many of the challenged agreements have included temporal limits, the term "cohabitation" has required the additional showing of an economic relationship akin to a shared possessory interest in one home. Such an interest can be proven with evidence that two people keep their personal belongings and receive their mail at the same address (*see Salas v Salas*, 128 AD2d 849 [1987], *lv dismissed* 70 NY2d 747 [1987]). Of course, the parties were free to condition support as they pleased, or to restrict the dependent spouse's postdivorce intimate relations. Had the Graevs desired to ascribe a different meaning to "cohabitation," they were free to do so by using appropriate language in their agreement.

The dissent faults our reliance upon *Clark, Ciardullo, Emrich* (*lv denied* 78 NY2d 860 [1991]), and *Scharnweber*, four unanimous appellate division cases providing that "cohabitation" requires a sharing of expenses. While the dissent correctly observes that these cases all originated in other departments, there is no First Department authority which conflicts with their holdings. Moreover, nothing in the Court of Appeals affirmance in *Scharnweber* indicates a rejection of the Appellate Division's holding that sharing of household expenses or functioning as an economic unit constitute elements of "cohabitation."

There is ample evidence that Mrs. Graev and MP spent in excess of 60 nights together during the summer of 2004, and Mrs. Graev does not deny that her relationship with MP was romantic. The number of nights that MP slept at Mrs. Graev's

Connecticut summer house is not decisive, because he had his own home and there is absolutely no evidence that the couple shared household expenses or functioned as a single economic unit. In other words, there was no showing that they "cohabited," as New York courts have consistently construed this term in this context. Mrs. Graev and MP did not live together. MP had his own residence, minutes from Mrs. Graev's summer house. MP kept all of his personal belongings at his own home, and he received his mail at that address. Mrs. Graev and MP did not assume each others' expenses or share bank accounts or credit cards. Mrs. Graev received all of her bills, paid her taxes, and voted in New York.

Mr. and Mrs. Graev agreed to dissolve their marriage, and the law requires that they adhere to the contract that they negotiated when they did so.

In *Hernandez v Robles* (7 NY3d 338, 358 [2006]), the New York Court of Appeals recognized the economic realities which distinguish a marriage from all other forms of committed relationships: "It is undisputed that the benefits of marriage are many. . . . some of the most important [include]: Married people receive significant tax advantages, rights in probate and intestacy proceedings, *rights to support from their spouses both during the marriage and after it is dissolved,* and rights to be treated as family members in obtaining insurance coverage and making health care decisions." (Emphasis added.) Consistent with that policy and the unambiguous terms of the parties' agreement herein, the motion court properly determined that Mr. Graev had not established a "terminating event" requiring Mrs. Graev to forfeit her right to maintenance. Concur—Mazzarelli, J.P., Williams and McGuire, JJ.

Andrias and Sullivan, JJ., dissent in a memorandum by Sullivan, J., as follows: By any rational understanding of the term, undefined in the parties' settlement agreement, "cohabitation" between the wife and MP was amply demonstrated by the evidence adduced at a hearing on that issue so as to warrant termination of the husband's obligation to pay spousal maintenance under the terms of the agreement.

A brief discussion of the events leading to the hearing is in order. The parties separated in 1994 after almost 24 years of marriage, and were divorced on June 6, 1997. The April 18, 1997 settlement agreement provided for an immediate financial payment to the wife and, pursuant to section 4.1, the payment of spousal maintenance in the amount of $120,000 per year, later adjusted pursuant to a cost-of-living increase to $11,000 per month. Maintenance was to continue until August 10, 2009,

subject to the occurrence of any one of several termination events, which included the "cohabitation of the Wife with an unrelated adult for a period of sixty (60) substantially consecutive days." The term "cohabitation" is not defined in the agreement.

In June of 2003, the husband became aware that the wife had become involved in an exclusive and serious relationship with an unrelated adult, MP. At a June 2004 family function, he overheard MP state that he and the wife would be living together in Connecticut that summer, after the wife finished her school year teaching. The same month, the husband hired a private investigative firm to conduct surveillance of the couple, the results of which convinced the husband that the wife and MP had cohabited for more than 60 days from June 11 through August 29, 2004. By letter to the wife dated September 7, 2004, the husband stated that she and MP had been cohabiting for a period in excess of 60 "substantially consecutive days," that the cohabitation had been documented by surveillance professionals, and that under the agreement, his maintenance obligations had automatically terminated. In accordance with his letter, the husband ceased his maintenance payments.

Thereafter, on October 13, 2004, the wife moved in Supreme Court, New York County, for a money judgment for $22,000 in maintenance arrears, with interest, as well as counsel fees. In her moving affidavit, the wife denied that she had cohabitated within the meaning of the agreement. The husband, supported by his own affidavit and one from the private investigator, cross-moved for summary judgment denying the wife's application on the ground that his maintenance obligation had terminated based on the wife's cohabitation with MP. The private investigator's affidavit stated that he commenced surveillance on June 13, 2004, at 4:30 A.M., when he observed the wife's and MP's cars in the driveway of her Connecticut home. A few hours later, MP left the house to retrieve the newspaper from the front of the property. The investigator left at 9:00 A.M., but returned at 7:30 P.M., when he again observed both cars in the driveway. The house lights were turned out at 9:00 P.M. The investigator stated that his firm conducted "extremely intensive surveillance" for a total of 63 days from June 14 to August 28, approximately nine hours daily. Except for a nine-day period when there were no signs of activity at either the wife's or MP's residence, MP's car was in the wife's driveway at approximately 5:00 A.M. virtually every morning that surveillance was conducted. Investigators regularly saw the wife and MP leave the house together for breakfast in the nearby village and regularly

saw MP picking up the morning paper and walking the dog outside the wife's home. The investigators also confirmed MP's absence from his own home. On August 18, 2004 both of MP's cars were in the wife's driveway. Apparently, he had moved many of his belongings from his home into her garage.

In her reply affidavit, the wife stated that during the relevant period she and MP had not engaged in any sexual relations. She stated MP had been "unable to perform sexually for some time" and the medication she was taking diminished any sexual desire on her part. Her relationship with MP during that period, she claimed, was a "sexless" one, a claim seriously undercut by evidence adduced at the hearing and an admission by MP that, during the period from March to November 2003 when the wife and MP claimed they were sexually abstinent, MP had his Viagra prescription filled at least six times. Both the wife and MP admitted that their relationship was an exclusive one. The wife, who claimed that her primary residence was in Manhattan, where she worked nine months each year as a school reading specialist, denied that she and MP "liv[ed] together" and asserted that he "made no financial contribution to her." She claimed that MP did not stay at her house on the "many days" she went to Manhattan or the two days her daughter visited in August 2004. MP's affidavit supported the wife's claims. In his reply, the husband argued that the term "cohabitation" employed in the agreement was intentionally broader than the term employed in Domestic Relations Law § 248.

On the basis of these submissions, Supreme Court (Judith J. Gische, J.), in an order, from which no appeal was taken, granted both parties' motions to the extent of ordering a hearing. The court held that although sexual intimacy may be one factor for consideration in evaluating whether parties have cohabited, the absence or presence of sexual intimacy is not dispositive. The court found the settlement agreement's provision terminating maintenance "far more expansive than the language found in section 248 of the Domestic Relations Law" since the agreement "does not require any kind of marital arrangement (e.g., 'holding out' as married persons)." It also rejected the wife's argument that a showing of living or residing together was required to demonstrate cohabitation. Prior to the hearing, the husband moved, in limine, for permission to introduce extrinsic evidence to establish the intent of the parties with respect to the cohabitation provision. The hearing court (Saralee Evans, J.) construed the earlier ruling in the unappealed order to mean that the term "cohabitation" was not ambiguous and held that extrinsic evidence as to its meaning was therefore inadmissible.

As the hearing testimony shows, the relationship between the wife and MP, which was concededly exclusive, began in October 2002. The wife testified that the relationship was sexual until March 2003, when, because of MP's physical dysfunction and her lack of desire due to the fact she was taking the medication Effexor, it became nonsexual. This testimony was seriously undermined, as noted, by MP's repeated renewals of his Viagra prescription, and by her doctor's testimony that from September 2000 until May 2001, while she was taking Effexor, she was able to have a sexual relationship, and by the testimony of the wife herself, on cross-examination, that she engaged in sexual relations with MP between January and March 2003, while taking the drug. Notwithstanding MP's alleged sexual dysfunction and the wife's lack of interest in sex, they continued, as she conceded, to sleep together, although as she insisted, only on weekends in her Connecticut home and on occasional evenings at her Fifth Avenue home. As the record shows, she socialized with him and her friends and slept with him in the summer of 2004 in her Connecticut home even when her daughter and daughter's intended husband visited.

As the surveillance evidence shows, during the entire relevant 79-day period from June 11 until August 29, 2004, there were only six days that the wife and MP were not together for at least part of the day. During this period, as the evidence shows, MP and the wife slept together for 61 substantially consecutive nights. He had access to a hidden key to the wife's Connecticut home, allowing him to come and go as he pleased. During this period, MP and the wife shared the same bed, established a routine in which they went to the village store together for breakfast, ran errands together, performed chores and engaged in activities around the wife's home together and had dinner together.

As with most exclusive, committed relationships, the wife and MP were ultimately involved in all the significant aspects of each other's lives. They attended family functions together; the wife was a participant in MP's family celebrations as was he in hers. At the wedding ceremony of the wife's daughter, MP sat in the front row area reserved for the family of the bride and appeared in wedding pictures taken with the closest family members.

From their first date in October 2002 through the hearing, the wife and MP split their shared costs equally. While this practice was uniformly followed when they were alone, the wife conceded that whenever they socialized with other couples, MP paid the bill and the wife would reimburse him at some other

time. When the couple traveled to New Mexico in the summer of 2004, during the period of surveillance (the nine-day period during which there were no signs of activity at either the wife's or MP's residence), the wife purchased the plane tickets, paying for them as well as most of the hotel expenses. And, significantly, MP conceded that he did not reimburse the wife for the plane tickets until after the commencement of this litigation.

The hearing court held that the wife did not cohabit with MP for a period of 60 substantially consecutive days, finding that while they enjoyed a "warm" relationship akin to adult dating, it fell short of any definition of cohabitation. In so finding, the court credited the testimony of the wife, who, as must be noted, had a significant financial stake in the outcome, as well as that of MP, although at one point the hearing court did concede that "some of MP's testimony appeared to have been prepared to corroborate [the wife's] testimony with regard to their lack of sexual intimacy."

We resist the temptation to engage in such a profound leap of faith. The testimony was full of inconsistencies and in flagrant disregard of contrary objective evidence. According the term "cohabitation" its dictionary and ordinary common sense meaning, we conclude that the deposition testimony of the private investigator and the utter implausibility of the testimony of the wife and MP on the question of sexual involvement during the requisite period, given the incontrovertible surveillance evidence and the admissions of the wife and MP, amply support the conclusion that they cohabited for the requisite period of time to establish an event of termination of maintenance under the settlement agreement.

The settlement agreement, as noted, does not define "cohabitation"; nor does it incorporate a definition of the term from another source. The parties may, if they choose, ignore the statutory standard of Domestic Relations Law § 248 (*Pesa v Pesa*, 230 AD2d 837 [1996] [holding oneself out as another man's wife]) for terminating the obligation to pay maintenance. In common usage, as reflected in various dictionaries, the word "cohabit" has several definitions and is not necessarily limited to a male/female relationship. The New Oxford American Dictionary (2d ed 2005) defines it as: "live together and have a sexual relationship without being married." Webster's Third New International Dictionary (2002) defines it as "to live together as or as if as husband and wife." And the Random House Webster's Unabridged Dictionary (2d ed 2001) defines it as: "1. to live together as husband and wife, usually without legal or religious sanction. 2. to live together in an intimate relationship."

The hearing court used yet another definition of cohabitation, from Black's Law Dictionary: "The fact or state of living together, esp. as partners in life, usu. with the suggestion of sexual relations." This definition is of limited use since it embraces the concept of a life partnership, a concept at odds with the agreement's 60-day period of cohabitation as a maintenance terminating event. As seems obvious, in the context of the agreement, cohabitation means living together in a sexual relationship for a period of 60 substantially consecutive days. Absent a claim of overreaching, overbearing or fraud, which is in no way suggested here, such a provision should be enforced as written (*W.W.W. Assoc. v Giancontieri*, 77 NY2d 157 [1990]; *Eiseman Levine Lehrhaupt & Kakoyiannis, P.C. v Torino Jewelers, Ltd.*, 44 AD3d 581 [2007]). That the wife so understood its meaning is readily reflected by the lengths to which she has gone to hide the sexual nature of her relationship with MP (*see Olstein v Olstein*, 309 AD2d 697, 699 [2003]).

Here, the evidence shows that the wife and MP were involved in a continuing sexual relationship, not a mere friendship, for a period of substantially 60 days, in which they represented themselves as a couple and were perceived as such by family members and friends. How and whether they pooled their resources, a factor significantly relied upon by the majority, is not determinative of cohabitation. It ill behooves any court to impose such a burden on the meaning of cohabitation, a fairly plain contract term. While the majority discounts the significance of dictionary definitions and suggests that attorneys drafting agreements are entitled to rely on judicial decisions construing the terms therein, *Clark v Clark* (33 AD3d 836 [2006]), the only decision it cites that held that the sharing of household expenses is an element of cohabitation, postdated the separation agreement by nine years.

In no dictionary definition of the term is the sharing of expenses an essential component of cohabitation or even a characteristic of the relationship. "[C]ourts often look to the dictionary to determine the ordinary meaning of a disputed term" (*Katz v American Mayflower Life Ins. Co. of N.Y.*, 14 AD3d 195, 206 [2004], *affd* 5 NY3d 561 [2005]). Nor, as noted, is it the statutory standard for terminating maintenance as set forth in Domestic Relations Law § 248 (*see Matter of Bliss v Bliss*, 66 NY2d 382 [1985]). In that regard, we are at a loss to comprehend the majority's statement—unsupported, as it is, by any citation of authority—that a "review of New York case law shows that in the context of these types of separation agreements, the term cohabitation has a plain meaning which contemplates changed economic circumstances."

Moreover, while financial interdependence may be a characteristic of marriage (*see* Heimdal & Houseknecht, *Cohabiting and Married Couples' Income Organization: Approaches in Sweden and the United States*, 65 J Marriage & Fam 525, 527 [2003]), and an essential factor in establishing succession rights to a housing accommodation under Rent Stabilization Code (9 NYCRR) § 2520.6 (o) (2) (*see Rent Stabilization Assn. of N.Y. City v Higgins*, 83 NY2d 156, 166-167 [1993]), it is not a prerequisite to finding cohabitation. Indeed, cohabiting couples in the United States are more likely to keep their finances separate (Heimdal & Houseknecht at 527). We do not take the position that financial interdependence is irrelevant. We merely state that under the terms of this agreement, it is not determinative of the issue of cohabitation, as the majority holds.

In emphasizing the sharing of expenses and acting as an economic unit in defining cohabitation, the hearing court ignored the way in which adults often choose to conduct their exclusive relationships. It is noteworthy that the New York State Legislature, in its statutory provision for the termination of spousal support (see Domestic Relations Law § 248 ["The court in its discretion . . . upon proof that the wife is habitually living with another man and holding herself out as his wife, although not married to such man," may terminate spousal support payments]), makes no reference to acting as an economic unit or sharing common expenses.

The hearing court, in support of its decision, cited *Matter of Emrich v Emrich* (173 AD2d 818, 819 [1991], *lv denied* 78 NY2d 860 [1991]), where a stipulation settling a divorce proceeding defined "remarriage" as including "Wife holding herself out as if she were remarried without an actual remarriage and/or residing on a substantially continuous basis (which shall be deemed to be for a period not less than sixty (60) days with another male and/or violation of the present section 248 of the Domestic Relations Law or any successor statute)." The Second Department held that the evidence failed to prove the wife was residing on a "substantially continuous basis" with another male, relying significantly on the absence of any evidence that the wife's male friend contributed to the wife's household expenses, such as mortgages and utilities, a factor we find not determinative. The hearing court further supported its decision here by stating that "all of the cases find that an essential element of cohabitation is a shared residence with shared household expenses. Cohabitation has been found where the couple functioned as an economic unit."

The majority concludes that the sharing of household expen-

ses is essential to a finding of cohabitation and goes to great pains to stress the absence of proof that the wife and MP shared such expenses or functioned as an economic unit, citing four cases—three from the Second Department (*Clark v Clark*, 33 AD3d 836 [2006]; *Matter of Ciardullo v Ciardullo*, 27 AD3d 735 [2006]; and *Emrich*) and one from the Fourth Department (*Scharnweber v Scharnweber*, 105 AD2d 1080 [1984], *affd* 65 NY2d 1016 [1985])—to support that proposition. All of the Second Department cases hark back to *Scharnweber*, and each of them cites the earlier cases as the only authority. In each case the court found that the evidence was insufficient to show that the "living together" or "cohabitation" condition had been demonstrated, relying only secondarily on the factor of sharing of expenses and acting as an economic unit. In the seminal *Scharnweber* decision, the Fourth Department concluded that the evidence established the wife and the unrelated male "do not share household expenses or a bedroom and do not function as an economic unit" (*id.*).

While the Court of Appeals affirmed *Scharnweber*, it did not address the question whether the sharing of household expenses or functioning as an economic unit is an element of cohabitation. The majority notes that nothing in the Court of Appeals opinion indicates a rejection of the Appellate Division's conclusion in this regard (which, of course, would leave the majority without any support for its holding). What is more significant, however, is that in affirming, the Court of Appeals did not endorse the principle that these are factors to consider in deciding whether cohabitation occurred.

In *Salas v Salas* (128 AD2d 849, 850 [1987], *lv dismissed* 70 NY2d 747 [1987]), another Second Department case relied upon by the majority, the parties entered into a stipulation of settlement that provided that maintenance would terminate and the marital residence would be sold upon the occurrence of certain events, including the wife's "living together with another male unrelated by blood." In finding that the wife and a man with whom she had a close personal relationship had not been cohabiting on a regular basis, the court relied upon the fact that while the friend slept at the former marital residence on occasion, he and the wife maintained separate residences and he frequently slept at the homes of his sister and brother. And, while the court also relied upon the fact that the wife and her friend "did not share household expenses and did not otherwise function as an 'economic unit' " (*id.* at 852), it cited *Scharnweber* for that proposition. *Salas* also cited another Second Department case, *Brown v Brown* (122 AD2d 762 [1986], *appeal dis-*

*missed* 68 NY2d 910 [1986]), which similarly relied on *Scharnweber*.

In *Emrich*, as noted, another Second Department case relied upon by the majority, the wife's male friend spent only three to four nights per week at her house over a period of more than a year, while maintaining a residence in another town. Also, there was no evidence that he contributed to the wife's household expenses other than occasional grocery purchases. Given these circumstances, the court found a failure of proof that the wife was residing on a "substantially continuous basis" with another male. The court did not hold, as the majority suggests, that a sharing of expenses was essential to a finding of cohabitation. While the absence of a sharing of household expenses was significant in the circumstances, as well as in the other cases relied upon by the majority, it was not the sole factor that precluded a finding of cohabitation, as is the case at bar. Nor in *Emrich*, which contained a "not less than sixty (60) days" period of cohabitation provision, did the wife and male friend share the same bed for 61 substantially consecutive nights and have breakfast together virtually each and every one of those days, as concededly happened here.

Moreover, the majority glosses over the evidence adduced at the hearing, asserting as fact that "[the Wife] and MP did not live together," an assertion belied by the surveillance logs and the deposition testimony of the private investigator. It also cites such meaningless circumstances as the fact that the wife votes and pays her taxes in New York, and ignores the fact that the termination event relates only to a substantially consecutive 60-day period, which, in this case, occurred during the summer, at a time when the wife resided in her Connecticut home.

The judgment should be vacated, and the husband's cross motion for summary judgment should be granted, declaring that his obligation to pay maintenance has terminated.